# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

MARK HARTMAN,

              Petitioner,            :    Case No. 3:19-cv-003

  - vs -                          District Judge Walter H.  Rice
                                      Magistrate Judge Michael R. Merz

OHIO ADULT PAROLE AUTHORITY,
                                :

              Respondent.

---

# REPORT AND RECOMMENDATIONS

This is a habeas corpus case brought by Petitioner Mark Hartman with the assistance of counsel.  As of August 21, 2019, counsel advised the Court that the case was ripe for decision without further filings by the parties (Notice, ECF No. 21).

**Litigation History**

On July 18, 2014, a Montgomery County Grand Jury indicted Hartman on three counts of rape in violation of Ohio Revised Code § 2907.02(A)(2).  Hartman pleaded not guilty, waived his right to trial by jury, and tried the case to the bench.  After a two-day trial in September 2014, the trial judge found Hartman guilty on all counts.  Before sentencing, Hartman filed a motion for new trial which was denied in a written opinion (Decision, State Court Record, ECF No. 5-1, Ex. 8). Hartman was then sentenced to four years' imprisonment on each count, to be served

concurrently.[1]

Hartman appealed but his conviction was affirmed. *State v. Hartman,* 2016-Ohio-2883 (Ohio App. 2nd Dist. May 6, 2016), appellate jurisdiction declined, 146 Ohio St. 3d 1515 (2016).

On April 27, 2015, Hartman filed a petition for post-conviction relief under Ohio Revised Code § 2953.21 (State Court Record, ECF No. 5-2, Ex. 20). On May 31, 2016, Judge Tucker granted the State's motion for summary judgment and dismissed the post-conviction petition on the merits (Decision, State Court Record, ECF No. 5-3. Ex. 25). Hartman again appealed to the Second District which again affirmed. *State v. Hartman*, 2017-Ohio-7933 (Ohio App. 2nd Dist. Sep. 29, 2017), appellate jurisdiction declined, 152 Ohio St. 3d 1424 (2018).

Hartman then filed the instant Petition for Writ of Habeas Corpus on January 3, 2019, pleading the following grounds for relief:

> **GROUND ONE:** Petitioner's Due Process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution were violated by the State's failure to prove each element of the offenses charged beyond a reasonable doubt.
>
> **GROUND TWO:** Petitioner's Due Process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution were violated when the state appellate court affirmed Hartman's convictions by retroactively applying new constructions of the elements of rape.
>
> **GROUND THREE:** Petitioner Hartman was prejudiced by being tried under the indictment that is constitutionally insufficient for its failure to provide notice, failure to insure [sic] that trial proceeded on the basis of the grand jury's findings, and failure to shield Hartman form subsequent prosecutions for the same offenses.
>
> **GROUND FOUR:** Petitioner's rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were violated because Petitioner was denied effective assistance of

---

[1] Because Hartman completed the imprisonment portion of his sentence after this case was filed but remains in the custody of the Adult Parole Authority, the Court substituted the APA as Respondent (ECF No. 20).

counsel when his trial lawyer failed to move to dismiss the constitutionally insufficient indictment.

**GROUND FIVE:**  Petitioner's rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were violated because Petitioner was denied the effective assistance of counsel when his trial counsel failed to request a bill of particulars.

**GROUND SIX:**  Petitioner Hartman's rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were violated when he was denied the effective assistance of counsel during the cross-examination of the alleged victim because his trial counsel introduced evidence on elements of the offense that the state had failed to prove and sought and received inadmissible hearsay that bolstered the State's case all to the prejudice of Hartman.

**GROUND SEVEN:** The admission of Mark Squibb's testimony in violation of *Crawford v. Washington*, 541 U.S. 36 (2004) violates Hartman's Sixth Amendment right to Confrontation.

**GROUND EIGHT:**  Trial counsel's failure to object to Mark Squibb's testimony, introduced in violation of *Crawford v. Washington*, 541 U.S. 36 (2004), violates Hartman's Sixth Amendment right to the effective assistance of counsel and requires habeas relief.

**GROUND NINE:**  Trial counsel's failure to secure Hartman's tape recorded statements prior to trial or, upon finding they did not exist, failure to withdraw as counsel so he could become a witness violated Hartman's Sixth Amendment right to the effective assistance of counsel and requires habeas relief.

**GROUND TEN:**  Trial counsel's failure to secure the diagram of the comforter stains from the Miami Valley Regional Crime Laboratory prior to trial and/or when provided with the diagram at trial, failed to seek a continuance to analyze same and to fully utilize it at Petitioner's trial and/or to recall witnesses who had previously testified, violated Hartman's Sixth Amendment right to the effective assistance of counsel and requires habeas relief.

**GROUND ELEVEN:**  Trial counsel's delivery of Petitioner's statement, to the lead detective, absent a knowing and intelligent waiver of the attorney client privilege and/or the attorney work product doctrine when the statement was concocted, violated

3

Hartman's Sixth Amendment right to the effective assistance of counsel and requires habeas relief.

**GROUND TWELVE:**  Trial Counsel's false and legally baseless reasons provided to Petitioner to support waiver of a jury trial violated Hartman's Sixth Amendment right to the effective assistance of counsel and requires habeas relief.

(Petition, ECF No. 1, PageID 2-3.)

# Analysis

## Ground One:  Insufficient Evidence to Convict

In his First Ground for Relief, Hartman claims he was convicted on insufficient evidence.

Respondent defends Ground One on the merits.

The Second District found the relevant facts as follows:

### I.      Late Night Party Leads to Sexual Encounter

[*P3] During his winter break from college, Mark Hartman agreed to spend the evening with his best friend, Gordon, who was housesitting at the home of a family friend.[2] Hartman, Gordon, and one other friend were drinking heavily. Gordon texted a female friend, Courtney, inviting her to the party. Courtney agreed, and brought two of her girlfriends with her, M.W.[3] and Cassie. The women arrived at the party around 11:00 p.m. Some time during the evening, M.W. texted her parents to let them know she would not be returning home that evening. After about one hour at the party, Cassie texted her friends to silently communicate that she wanted to leave, because she was allergic to the dog in the house. Courtney and M.W left the party and took Cassie back to Courtney's house, where she had left her car. M.W. and Courtney returned to the party

---

[2] This house is sometimes referred to in the record as the "tree house" and its owners are named Routsong.
[3] The complaining witness is Molly Weckesser.

4

after 1:00 a.m. and joined the men in their drinking and card-playing.

[*P4] After the third male went to bed, Courtney and Gordon were in the bathroom together, which left M.W. and Hartman alone in the living room. M.W. testified that she wanted to go to bed, and Hartman agreed to show her to a bedroom. M.W. testified that she was a willing participant when Hartman began to kiss her. After this point, M.W.'s and Hartman's versions of the facts began to diverge.

[*P5] M.W. testified that after she and Hartman entered the bedroom, he initiated kissing, and she was okay with that. She testified that as Hartman continued to kiss her, he put his hand up her shirt, she said no, and he stopped. M.W. testified that "then we kept kissing and he pushed me onto the bed, and then he went up my shirt again. And again I said no. Which was fine. So we kept - - we kissed again. And then that's when he started to go down my pants, and I said no. And that's when it didn't stop. He just kept saying things like, it's fine, it will be okay, it will be fun, stuff like that. So then he went ahead and took off my shirt and bra." Trial Transcript at 29.

[*P6] M.W. testified that she began to get nervous because she was not sure what was going to happen. She testified that Hartman continued to go down her pants again as he was kissing her, and she kept saying "no, that I didn't want to do that." *Id*. at 30. She described that he removed her shirt, bra, and leggings, and then removed his own clothes. She testified, "that's when I basically just started to get really scared about the situation and wasn't sure how to handle the situation." *Id*. She explained the basis of her fear by testifying:

> I was scared because I knew that I was not as strong as he was, and I knew that if he would have done anything like hit me or anything like that I would have been out and I wouldn't have really remembered what had happened. And it was more important to me to remember what was happening to me than not know what was happening to me. As a girl growing up in your teenage years, you hear a ton of stories about what people can do to you and what, you know, strangers do and you don't know the person and you're not sure what they're going to do. So it just really scared me to not - - like and I didn't know who was around me. I didn't know where Courtney was. I didn't know where anyone else in the house was. And I just got really scared

5

> that something bad might have happened to me. And then
> I kept thinking that in this situation I can outsmart the
> situation, and you know, I can get out the smart way. And
> I like have been told how to get out of these situations and
> how to be smart. So that's what I kept thinking, was how I
> was going to get out because I knew I wasn't strong enough.
> And I was worried about being hit, or something.

*Id*. at 32.

[*P7] M.W. testified that Hartman continued to kiss her — causing the hickeys on her neck, and he continued to touch her in different places, including penetrating her vagina with his fingers. When asked what she was doing at this point, M.W. responded:

> I was just sitting there. A few times I had started to go along
> with it because I thought that if I went along with some of
> it, he might let me go and he might think that I was like
> kind of into it, too, and that if he thought that, that he might
> let me leave or like go and do something to the point where
> I could try and get out and escape. But basically, the whole
> time I would say no before and I just kind of sat there. I
> wasn't really into it or doing anything back. I was just there.

*Id*. at 35.

[*P8] M.W. testified that Hartman proceeded to penetrate her vagina with his penis after she said no, and that he kept saying "like its okay, it will be fine, it will be fun, don't worry about it." *Id*. at 36. M.W. testified that she kept saying no, and was numb because she was so scared. She testified that he stopped, took a break, and then began touching her again, and again penetrated her vagina with his penis. Afterwards, M.W. testified that she left the room and went into the bathroom, and that Hartman followed her, and began kissing her again. She described that he grabbed her arms, using enough force to pull her into the shower with him. She again testified that she "started to go along with it, too, because I was scared it was going to  happen again and I wanted to get out of the situation, and I was like maybe -- again, I kept thinking the same thing. If I go along with this, there might be a chance that I can get out of this situation. So that's what I kept thinking the whole time was if I go along with this for a little bit, there might be a chance that I can get out and this wouldn't have happened to me." *Id*. at 40.

6

[*P9] M.W. testified that after they showered, they returned to the bedroom, and Hartman began kissing her again, pushed her back onto the bed and again he penetrated her vagina with his penis. M.W. testified that "I was just so numb and didn't really feel like fighting back because I was so scared. And I was like, you know what, I'll just let it happen and then it will be done and then I'll get out of the situation." *Id*. at 41. M.W. testified that when he was done, she attempted to leave the bed, but he pulled her back into the bed. When she thought Hartman was asleep, she tried to move, but he was still awake and he asked her to stay. M.W. testified that she agreed to stay there with him "because I didn't want anything to happen again." *Id*. at 42.

[*P10] Hartman's version of the facts was presented though the admission of a written statement he gave to the police the day after the event, State's Ex. 24, the testimony of the officer who interviewed him, and from Hartman's testimony at trial. Hartman admitted that he was intoxicated earlier in the evening, but he testified that he had stopped drinking alcoholic beverages, and was drinking water before the sexual encounter. He testified that M.W. initiated intimacy by kissing him before they went to the bedroom. He testified that they engaged in a good amount of kissing, and when he began to feel her breasts, and when he slid his hand down her pants, he specifically asked if she would like to have sex, and she answered yes. He testified that she willingly participated in the sexual encounter by helping to remove her own clothes and his clothes, asked him to squeeze her breasts and guided his hand, switched positions, and upon request willingly engaged in oral sex. Hartman testified that the only time she said "No" was when he asked if "we could have sex until we finished, and she said no at that time." He stated that he stopped after she said "No," and then they conversed a bit, talking about life, relationships and school, and then he asked again "if we could finish," and she said, "Yes, go ahead." Because he did not have a second condom, he asked if she was on birth control, and she replied, "you really think I would have sex with a random 20 years old without birth control?" His testimony that he pulled out and ejaculated on the bed was later corroborated by DNA testing on the bed coverings. The fact that M.W. was taking birth-control medication was reflected in hospital records.

[*P11] The victim's testimony reflects that she did have her cell phone with her that evening -- she received a text from the other female at the party that she wanted to go home, and she texted her parents to tell them she would not be coming home that evening.

7

The text messages that M.W. and her friend Courtney sent to each other later that morning were admitted into evidence as defendant's Ex. H. In the text messages, M.W. expressed reluctance about reporting the sexual assault, in the following exchange:

> M.W.: I need to think about if I want to press charges or not.
>
> Courtney: What are you thinking?
>
> M.W.: I don't know. I really don't know.
>
> Courtney: Are you wanting to confront him?
>
> M.W.: No. I don't ever want to talk to him. I just don't know if I should press charges and it'll be big because "rape in the [R.] house."
>
> Courtney: I didn't even think of that. He needs to know what he did was wrong. Was protection used? And did you shower before or after? As far as the [Rs], oh well
>
> M.W.: I know. I agree but I can't handle a big thing. I can't even remember things because I was so in shock. I'm not sure if he did it [or] not. And in between.

[*P12] After M.W. told her parents what had happened to her, she was taken to the hospital, arriving at 3:39 P.M. She was initially examined by an ER doctor, then she talked to the police detective, and then she was referred to a nurse designated as a "sexual assault nurse examiner." [footnote omitted] This nurse interviewed M.W., making notes, Ex. 20, which recorded the victim's allegations as follows:

> Courtney and I went back to the house that one of the guys was housesitting for. Me and Mike[4] was taking a tour of the house when he showed me to the bedroom which was downstairs. Mike kissed me on the lips and tried to take my shirt off and I said no, I'm not doing that. He (clarified with patient that he was Mike) kept kissing me over and over again and I kept yelling at him, telling him to stop. That's when things went from bad to worse. Mike pushed me on the bed and I landed on my back. He kept trying to kiss me

---

[4] Referring to Petitioner whose first name is Mark.

8

and this time pulled off my shirt. He held my hands down beside me and kissed all over my neck, face and chest. He (clarified with patient that he is Mike) pulled off my leggings. I kept telling him no, get off of me, but he didn't. He had sex with me and stuck his hands inside of me. I managed to get free and go to the bathroom, and he followed me in there, grabbing my arms trying to pull me in the shower, asking me to take a shower with him. When I wouldn't he got mad and pulled on my arms back into the bedroom. He raped me again. Clarified with patient that Mike stuck penis and hands inside of vagina. I kept trying to leave but he wouldn't let me. My friend finally came upstairs and got me out of there.

[*P13] The medical records also indicate that during the process at the hospital, the victim's parents were present, and also present were the victim witness advocate, an Oakwood police officer and an Oakwood police detective. The medical records confirm that M.W. was not physically injured during the assault, other than the neck bruising referred to as hickeys. M.W. testified that since the event, she is no longer a social person, that she is scared to do anything, and no longer goes anywhere alone.

[*P14] The day after the alleged incident, defense counsel advised Hartman to create a written description of everything about the incident, which was given to police two days after the incident. Defense counsel accompanied his client to two police interviews. Hartman freely answered all questions asked during the interviews.

*Hartman I*, 2016-Ohio-2883.

The Second District then decided the sufficiency of the evidence claim as follows:

[*P23] Hartman's First Assignment of Error asserts as follows:

THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN THE CONVICTIONS.

[*P24] Hartman was indicted for three counts of Rape, in violation of R.C. 2907.02(A)(2). Under this section, to obtain a conviction for Rape, the State must prove beyond a reasonable doubt that the accused engaged in sexual conduct with another by purposely compelling the other person to submit to the sexual conduct by force or threat of force. Hartman has admitted that he engaged in sexual

9

conduct with another. The question is whether sufficient evidence was presented to prove beyond a reasonable doubt that he purposely compelled M.W. to submit to the sexual conduct by force or threat of force.

[*P25] A challenge to the sufficiency of the evidence presents a question of law as to whether the State has presented adequate evidence on all elements of the offense to sustain the verdict as a matter of law. *State v. Hawn,* 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jackson,* 2d Dist. Montgomery No. 26050, 2015-Ohio-5490, P 41, 63 N.E.3d 410, quoting *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

[*P26] Pursuant to R.C. 2901.22 (A), "[a] person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." Therefore, in a Rape case, to prove that the defendant acted "purposely," the State must prove that it was the defendant's intention to engage in sexual conduct by forcefully compelling the other person to submit to the sexual conduct. "A rape occurs only if the perpetrator purposely compels the other to submit by force or threat of force." *State v. Wilkins,* 64 Ohio St.2d 382, 385, 415 N.E.2d 303 (1980).

[*P27] Ohio's rape statute does not require proof of the victim's lack of consent. Ohio law does recognize certain victims incapable of giving consent, based on mental or physical incapacity. Those exceptions do not apply in the case before us. See, e.g., *State v. Hillock,* 7th Dist. Harrison No. 02-CA-538, 2002-Ohio-6897. Consent is not an affirmative defense, but when applicable, consent is used as a defense to challenge the State's evidence on the element of purposeful force or compulsion. *State v. El-Berri,* 8th Dist. Cuyahoga No. 89477, 2008-Ohio-3539, P 57. When consent is raised as a defense to a charge of Rape, the test of whether consent

10

negates a finding of force is not whether a reasonable person confronted with similar circumstances would have understood that the victim did not consent, the test requires the trier-of-fact to find, beyond reasonable doubt, that the specific defendant's purpose or intent was to commit the crime of rape. *State v. Mundy*, 99 Ohio App.3d 275, 650 N.E. 2d 502 (2d Dist. 1994). As we discussed in *Mundy*:

> The determination of a defendant's mental state, absent some comment on his or her part, must of necessity be determined by the nature of the act when viewed in conjunction with the surrounding facts and circumstances. *State v. Lott* (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293, 302. This is, in fact, the well-recognized process of inferential reasoning. This process by necessity incorporates an objective mechanism or standard in determining the defendant's state of mind by the use of circumstantial evidence. The trier of fact reviews the defendant's conduct in light of the surrounding facts and circumstances and infers a purpose or motive.

*Id.*, 99 Ohio App.3d at 288, 650 N.E.2d 502.

[*P28] R.C. 2901.01(A)(1) defines "force" as any "violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." In the case before us, the trial court did not find that Hartman used physical constraint or any form of violence that caused physical harm during the sexual encounter. The trial court did not find that Hartman constrained the victim in any way or that the victim exhibited physical resistance to Hartman's advances. However, the trial court did find that Hartman "pushed" M.W. onto the bed, removed her clothes, laid on top of her, and pulled her into the shower. It has been recognized that proof of physical violence or physical resistance is not required to establish Rape if the defendant creates in the mind of the victim the belief that physical force will be used if the victim does not submit. *State v. Umphries,* 4th Dist. Ross No. 11CA3301, 2012-Ohio-4711, P 21, and P 16, citing *State v. Schaim,* 65 Ohio St. 3d 51, 55, 1992 Ohio 31, 600 N.E. 2d 661 (1992). "The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge,* 38 Ohio St.3d 56, 526 N.E.2d 304 (1988). "Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or

11

duress, the forcible element of rape can be established." *Umphries* at ¶16, quoting *State v. Fowler,* 27 Ohio App.3d 149, 154, 27 Ohio B. 182, 500 N.E .2d 390 (8th Dist. 1985).

[*P29] In the case before us, the victim testified that her will was overcome by fear, because she believed she would be hurt if she did not submit to Hartman's advances. To find that her will was overcome by fear, the trier-of-fact must have sufficient evidence from which to infer that her fear was based on some wrongful action or conduct of the defendant that purposely compelled her to submit to the sexual conduct, against her will. In the case before us, the trial court stated, "that the force element must be viewed within the context of M.W.'s concerns regarding Mr. Hartman's size and strength, that Mr. Hartman was intoxicated, that she did not know Mr. Hartman, and that, as the sexual conduct was occurring, she did not know the location of the remaining occupants of the house." Dkt. #80, pg. 10.

[*P30] Hartman testified that he is 6'3", weighed 200 pounds, and was physically fit. Medical records reflected that M.W. is 5'3" and weighed 165 pounds. Hartman and M.W. were both 20 years old, and both were college students. The victim testified that she was scared because she was not as strong as Hartman, and she believed that he would use his superior strength to hurt her if she did not submit to his sexual advances. The victim testified that she repeatedly said "No" to Hartman during the sexual encounter. The physical force described by the victim included her testimony that Hartman "pushed" her onto the bed, removed her clothing, laid on top of her, and "pulled" her into the shower.

[*P31] Each of the cases cited by the State addressing the issue of force is distinguishable from the case before us. In *Umphries*, the victim felt compelled to submit out of fear when she awoke during the night to find her uncle on top of her, who had broken into the house through a window, and she begged him to stop. *State v. Umphries*, 4th Dist. Ross No. 11CA3301, 2012-Ohio-4711. There was no admission that the victim in *Umphries* was a willing participant to any part of the encounter, and she communicated her fear by begging him to stop. *Id*. The victims in Whitt, Shannon, and Eskridge were minors. *State v. Whitt,* 8th Dist. Cuyahoga No. 82293, 2003-Ohio-5934; *State v. Shannon,* 11th Dist. Lake Nos. 2002-L-007, 2002-L-008, 2004-Ohio-1669; *State v. Eskridge,* 38 Ohio St.3d 56, 526 N.E.2d 304 (1988). In *State v. Patel*, we found sufficient evidence of force when an employer held his employee "in a locked

bathroom and inserted his finger in her vagina against her will and while ignoring her plea to stop." *State v. Patel,* 2d Dist. Greene No. 2010CA77, 2011-Ohio-6329, P 63. Unlike in the case before us, the defendant in Patel locked the room to prevent the victim from leaving, and no part of the sexual encounter was consensual. *Id.* None of the cited cases present a fact pattern in which a sexual encounter between adults starts out as consensual, before changing into a non-consensual encounter.

[*P32] We agree that the elements of Rape can be established when the two participants start the sexual encounter on a consensual basis, but the consent is revoked by words, actions or conduct that clearly communicates non-consent, the defendant fails to respect the change in consent, and purposely proceeds to engage in sexual conduct through force or threat of force evidenced by violence, physical restraint, or some type of coercive or threatening conduct that creates a belief or fear that physical force will be used if the victim does not consent. In the case before us, both the defendant's physique -- he was bigger and stronger than his victim -- and his conduct of pushing the victim on the bed, removing her clothes, and pulling her into the shower, was evidence from which a reasonable finder of fact could find that he purposely acted in a manner that induced fear in the victim, compelling her to submit to his sexual conduct, against her will.

[*P33] Based on our review of the record, we conclude that the State did present sufficient evidence from which the trier of fact could conclude that Hartman purposely compelled M.W. to submit to sexual conduct by force or threat of force. There is no dispute that it was Hartman's intention to engage in sexual conduct with M.W. Also, the testimony of the victim, if believed, supports a finding that Hartman used force to compel M.W. to submit to sexual conduct at least three times during the course of the evening. Hartman's First Assignment of Error is overruled.

*Hartman*, 2016-Ohio-2883.

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia,* 443 U.S. 307, 315 (1979), citing *In re Winship*, 397 U.S. 358, 364 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders*, 894 F.2d 792, 794 (6th Cir. 1990)(*en*

*banc*). For a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio Oct. 11, 2007). This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991). Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.*

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"), two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the

> prosecution. Second, even were we to conclude that a rational trier
> of fact could not have found a petitioner guilty beyond a reasonable
> doubt, on habeas review, we must still defer to the state appellate
> court's sufficiency determination as long as it is not unreasonable.
> See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  In a sufficiency of the evidence habeas corpus

case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to

the appellate court's consideration of that verdict, as commanded by AEDPA.  *Tucker v. Palmer*,

541 F.3d 652 (6th Cir. 2008); *accord Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011)(*en banc*);

*Parker v. Matthews*, 567 U.S. 37, 43 (2012).  Notably, "a court may sustain a conviction based

upon nothing more than circumstantial evidence."  *Stewart v. Wolfenbarger,* 595 F.3d 647, 656

(6th Cir. 2010).

> We have made clear that *Jackson* claims face a high bar in federal
> habeas proceedings because they are subject to two layers of judicial
> deference. First, on direct appeal, "it is the responsibility of the jury
> -- not the court -- to decide what conclusions should be drawn from
> evidence admitted at trial. A reviewing court may set aside the jury's
> verdict on the ground of insufficient evidence only if no rational trier
> of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.
> S. 1, [2], 132 S.Ct.2, 181 L.Ed.2d 311, 313 (2011) (*per curiam*). And
> second, on habeas review, "a federal court may not overturn a state
> court decision rejecting a sufficiency of the evidence challenge
> simply because the federal court disagrees with the state court. The
> federal court instead may do so only if the state court decision was
> 'objectively unreasonable.'" *Ibid*. (quoting *Renico v. Lett*, 559 U.
> S.766, 773, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 651, (2012)(*per curiam*); *Parker v. Matthews*, 567 U.S. 37, 43

(2012) (*per curiam*).  The federal courts do not make credibility determinations in reviewing

sufficiency of the evidence claims.  *Brooks v. Tennessee,* 626 F.3d 878, 887 (6th Cir. 2010).

In his Reply, Hartman asserts the Second District's decision is both an unreasonable

application of clearly established federal law (*Winship* and *Jackson*) and an unreasonable

15

determination of the facts based on the evidence presented (ECF No. 18, PageID 1947, *et seq.*). Specifically Hartman argues that "the State failed to meet its burden of proof on the elements of force, threat of force, and culpable mental state. . . ." *Id.*

Hartman rightly notes that, under *Winship* and *Jackson*, the elements of a crime are established by state law. As relevant law, Petitioner relies on *State v. Schaim*, 65 Ohio St.3d 51, 55 (1992), and *State v. Dye*, 82 Ohio St.3d 323, 327 (1998).

Hartman argues that the State tried this case on the theory that in a rape case the victim's expression of lack of consent is sufficient, that 'no' means 'no'." Reciting the history of recent efforts to reform rape law to reflect this theory, Hartman argues that this has not become the law in Ohio and that the State must still prove in an Ohio rape case[5] that the defendant purposely used force or the threat of force to compel the victim to submit against her will (Reply, ECF No. 18, PageID 1951-54).

Hartman takes issue with Judge Tucker's preliminary findings of fact in his decision to deny a new trial which were:

> There is, focusing on a few preliminary evidentiary findings, a marked discrepancy between Mark Hartman's size and strength and Molly Weckesser' s size and strength. Mark Hartman, in the hours before the sexual conduct, consumed a significant amount of alcohol. Ms. Weckesser and Mr. Hartman had not met before the December 30-31 "get together" at the Routsong's Oakwood home. Ms. Weckesser, in fact, referred to Mr. Hartman as "Mike" in the immediate aftermath of that which occurred. Ms. Weckesser had not previously been in the Routsong home, and, thus, was not familiar with the home's layout which, apparently, is rather unique. Ms. Weckesser did not know where the remaining occupants of the home were as the critical events unfolded. Molly Weckesser, in short, was confronted with the following as the sexual conduct occurred – a

---

[5] Petitioner notes that the relevant statute has been amended effective March 22, 2020, but still does not adopt the theory that lack of consent is sufficient (Reply, ECF No. PageID 1954). Of course, the statute in effect at the time of the alleged offenses is the one which must be applied here.

> larger, stronger, and intoxicated individual she did not know (and,
> thus, she could not gage [sic] how he might react) with the events
> occurring in an unfamiliar home at a time when she did not know
> the location of the home's remaining occupants.

(Reply, ECF No. 18, PageID 1955-56, quoting State Court Record, ECF Doc. 5-1, New Tr. Dec.,

PageID 83.) Reminding this Court that the "force" element in a rape case must be the action of

the defendant, *id.* citing *Schaim*, Petitioner argues, "None of the preliminary facts found by the

trial judge is the result of any action Hartman took with regard to Weckesser and thus cannot be

considered an aspect of, or basis for finding, the element of force." *Id.* at PageID 1956. Disparity

of size is argued to be irrelevant. *Id.* at PageID 1956-58. Hartman's voluntary intoxication is

disallowed as impacting his mental state under Ohio law. *Id.* at PageID 1958. The third finding

is said to be about Weckesser's knowledge and therefore irrelevant to the force element. *Id.* at

PageID 1959-60.

The Magistrate Judge disagrees with this analysis. The force element of the rape statute is

objective: did the defendant do some act which constituted the use of force or the threat of the use

of force with the force element defined as "a physical action exerted against the one compelled"

Ohio Revised Code § 2901.01(A)(1), *Schaim*, 65 Ohio St.3d at 55. The next element is that the

defendant must have acted purposely, i.e., with the intention of compelling the victim to submit.

But the victim's reaction to the force or threat of force must be that she felt compelled. In

Petitioner's counsel's own words, "the force used must have compelled submission. R.C.

2907.02(A)(2)." (ECF 18, PageID 1950.) "'[F]orce or threat of force' is not proven unless and

until the State proves beyond a reasonable doubt that the will of the victim was overcome." *State

v. Euton*, 2007-Ohio-6704, ¶43, 2007 Ohio App. LEXIS 5883 *22 (3rd Dist., Auglaize, No. 2-06-

35, 12/17/2007)." *Id.*

To put it another way, the force or threat of force must actually have caused the victim's submission; it must be compelling, the efficient cause of the victim's giving in to sex.

These preliminary findings of fact by Judge Tucker are very relevant to Weckesser's state of mind as to whether she felt compelled. Petitioner discounts Weckesser's testimony about her fears which she said arose in part from what she had learned growing up about possible harms from "date rape" situations. But the aggressor in a sexual situation takes his victim as he finds her. The State had to prove that Weckesser was in fear and her explanation of why she was in fear were appropriate.

Counsel repeat many times that Weckesser came back to the Routsong house intending to stay the night, that she knew Hartman had been drinking heavily, that she had never been in the house before and did not know its layout, that this was the first time she had ever met Hartman (Reply, ECF No. 18, PageID 1961-65). She also knew when she went back to the house that her girlfriend Courtney had been a sexual partner of the other awake male present, Gordon, so that if the two of them went to bed together, she would likely be "left" with Hartman. She also had in her head when she went back all of the accumulated "horror" stories that she had learned in her teenage years about the dangers of date rape. Nonetheless she went back. She took a very serious risk and the consequences for her post-event life have been serious according to her testimony. But taking a risk is not the same as giving consent.

Hartman's Reply proceeds for many pages to slice Judge Tucker's findings as if with a microtome. It asserts the judge intermingled irrelevant facts about Weckesser's state of mind with factual findings about force. The Reply goes so far as to argue:

> How much force is required to accomplish any given task is a mathematical construct. It is not dependent on the thoughts of the parties. In a rape prosecution, what was going through the victim's mind at the time of the incident is irrelevant to the question of guilt. See *State v. Hart*, 72 Ohio App. 3d 92, 96, 593 N.E.2d 463 (10th Dist., Franklin 1991). Ohio does not permit consideration of the victim's perception of an aggressor to be considered in the proof of the element of force except in the cases of child victims.

(ECF No. 18, PageID 1965.) The Magistrate Judge disagrees. Conducting a rape trial is not an exercise in physics, determining how much "force" is needed to accomplish a physical task. Rather, the question is how much physical force or threat of force was actually used and was it successful in compelling the victim's submission.

Hartman relies on *State v. Hart*, 72 Ohio App. 3d 92 (10th Dist. 1991). There the Tenth District upheld an attempted rape conviction over a claim that the trial court had improperly allowed the victim to testify to her belief that the defendant was going to rape her. The defendant there had argued, as does Petitioner here, that it was his state of mind and not that of the victim that was in issue. The Tenth District agreed, but found no prejudice because there was ample evidence of attempted rape: beating, ripping off of underwear, and digital penetration. But in an attempted rape case, it is only the defendant's state of mind that matters because the victim has not submitted and therefore the question of what caused her to submit does not arise. *Hart* does not stand for the proposition that the victim's state of mind is irrelevant in a completed rape case.

For the proposition that the victim's perception of the aggressor is irrelevant, Hartman relies on *State v. Dye*, 82 Ohio St.3d 323, 327 (1998), *State v. Schaim*, 65 Ohio St.3d 51, 54-55 (1992), and *State v. Eskridge*, 38 Ohio St.3d 56, 58 (1998). (ECF No. 18, PageID 1965.)

In *Dye* the Supreme Court of Ohio reinstated the life sentence of a defendant convicted of rape of a nine-year-old boy. In doing so it quoted *Eskridge*:

> In *Eskridge*, the defendant was convicted of raping his four-year-old daughter by force. This court reinstated the defendant's conviction and held that "the force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength. (*State v. Labus* [1921], 102 Ohio St. 26, 38-39, 130 N.E. 161, 164.)" *Id.*, paragraph one of the syllabus.

82 Ohio St. 3d at 326. Thus, although both *Dye* and *Eskridge* were child rape cases, the court did not limit the relevance of relative size and strength to cases involving children.

Coming to the Second District's decision, Petitioner reads it as "reject[ing] the trial court's determination that physical force had compelled Weckesser's submission." (Reply, ECF No. 18, PageID 1969). To reach that conclusion, Hartman relies on the Second District's statement that "the trial court did not find that Hartman used physical constraint or any form of violence that caused physical harm during the sexual encounter. The trial court did not find that Hartman constrained the victim in any way or that the victim exhibited physical resistance to Hartman's advances." *Hartman*, 2016-Ohio-2883 at ¶28. With respect, that is not a rejection of Judge Tucker's finding of use of force or threats of force. "Force" is not necessarily violence. Weckesser did not suffer any physical harm with the exception of the bruising from rough kissing on her neck. Rather, as Judge Tucker found, she submitted for fear that she would be physically harmed. There was in fact no evidence of physical constraint except for Hartman's lying on top of Weckesser at one point in time. Nor was there evidence of physical resistance on Weckesser's part, but lack of physical resistance does not equate to consent. Attempting to drive a logical wedge between the trial court's decision and that of the court of appeals, Hartman argues the Second District's decision was based only on threats of force (Reply, ECF No. 18 PageID 1970):

20

> [B]oth the defendant's physique -- he was bigger and stronger than his victim -- and his conduct of pushing the victim on the bed, removing her clothes, and pulling her into the shower, was evidence from which a reasonable finder of fact could find that he **purposely acted in a manner that induced fear in the victim, compelling her to submit to his sexual conduct, against her will.**

> *Id*. at ¶32 (emphasis added). Never **finding** an actual threat of force, the court of appeals said that "a threat of force" could be found in the combination of Hartman's physique and actions.

(ECF No. 18, PageID 1970, emphasis in Reply.) Thus, with one stroke Hartman discounts the findings of actual force -- pushing the victim on the bed, removing her clothes, and pulling her into the shower – and faults the court of appeals for not finding an "actual" threat, by which Hartman presumably means a verbal threat. In determining whether a gunman has threatened a victim with a gun, we do not demand evidence that the gunman said, "This is a gun. If I continue pointing it at you and pull this trigger, you will die."

Hartman extends his dissection of findings approach to further findings of the court of appeals. Noting the Second District's findings about Hartman's physique, he argues:

> [T]he defendant's physique is not a circumstance from which any aspect of a culpable mental state can be inferred any more than one could infer intent from the color of eyes, skin, or hair. Physique is a physical fact. It simply does not indicate or legitimately allow any inference about Hartman's state of mind/purpose.

(Reply, ECF No. 18, PageID 1971.) Of course, physique alone is insufficient for finding *mens rea*. But the court of appeals did not rely on physique alone. Instead it found that this particular individual, who was in good physical condition but was drunk and substantially outweighed his victim, pushed her onto a bed and inserted his hand in her pants, had the purpose of compelling her to submit to sex.

Hartman discounts his pushing Weckesser onto the bed by saying she continued to kiss him after they were on the bed, claiming the kissing was consensual (Reply, ECF No. 18, PageID 1972).  Even assuming that sexual contact – kissing – that occurs after force is used must be construed as consensual, Weckesser expressly testified that she did not consent willingly to either the subsequent breast manipulation or digital or penile penetration.

Hartman next attacks the Second District's finding of *mens rea.*

> Purposely acting in a manner that induced fear in Weckesser . . . is not proof of a threat of force used to compel submission. The statutory purpose required to be proved is **the purpose to compel submission** by use of a threat of force. (R.C. 2907.02(A)(2): "purposely compels the other person to submit by force or threat of force.") Purposely acting in a manner that caused fear does not meet this requirement. A person can purposely act in a manner that inadvertently causes fear. A person can purposely act in a manner that causes fear without intending to compel submission. The court of appeals' conception of the purposeful conduct required to commit rape eliminates the requirement that the purpose must be to compel submission against the will of the victim. *Jackson*, 443 U.S. at 324 n. 16. No reasonable fact finder could find the culpable mental state element of purposely compelling submission on the basis identified by the court of appeals or on the evidence presented at trial.

(Reply, ECF No. 18, PageID 1974.)  The facts as proved at trial are that Hartman had a lot to drink. It is reasonable to infer from that fact that his inhibitions were lowered; most people's are. Hartman was substantially bigger than Weckesser from which can reasonably be inferred that he was capable of acting forcibly on her.  He did act forcibly on her – pushing her on the bed, pulling her into the shower.  He wanted to have sex with her by his own admission.  The forcible acts were related to possible sex – he did not show he was strong by ripping up telephone books.  Instead the forcible acts found both by the trial and appellate courts involved intentional contact between his body and hers.  Given those facts, there is nothing irrational about inferring a purpose to get her to

22

go to bed with him.  At law, intent must usually be inferred from circumstances.  In this case Hartman does not suggest a different intent that could reasonably have been inferred from his forcible acts other than to persuade Weckesser to have sex with him.  For what other reasons does a drunk twenty-year-old male push a woman with whom he is alone and with whom he wants to have sex onto a bed?

Hartman's counsel proclaim their belief that is actually innocent (Reply, ECF No. 18, PageID 1947).  The Magistrate Judge believes that is appropriate, although a prosecutor may not proclaim to a jury his or her belief in a defendant's guilt.  If the undersigned had been the trial judge, he might have agreed, which is to say he might have found Hartman credible and Weckesser's testimony worthy of belief.  In the circumstances of contemporary "hookup" culture, young men and women subject themselves to the risks inherent in combining alcohol, hormones, and freedom from parental supervision.  Those risks include unintended pregnancy which is often a disaster for both parents and the child; Hartman and Weckesser apparently recognized that risk and guarded against it with contraception.  But the other serious risk is that the law now takes nonconsensual sex much more seriously than it did heretofore.  Any participant in sexual conduct ought to appreciate the risk that the other participant will convincingly reconstruct the event in a court of law in a way that misallocates responsibility for what happened.  Had Judge Tucker believed Hartman's account of what happened, which in itself is not incredible given the circumstances, Weckesser would now be branded as a liar who refused to take responsibility for her bad choices.[6]

But habeas corpus courts do not remake credibility determinations already made at trial

---

[6] She would not, however, have been convicted of perjury and spent time in prison as a result.  Despite its everyday occurrence in courts, perjury is rarely prosecuted.

and on state court appeal.  Because there was evidence which, when construed most favorably to the prosecution, was sufficient to prove Hartman guilty beyond a reasonable doubt, and the state appellate court's decision was neither an unreasonable application of federal law as determined by the Supreme Court, nor an unreasonable determination of the facts, 28 U.S.C. § 2254(d), Hartman's first ground for relief should be denied on the merits.


**Ground Two:  Unconstitutional Retroactive Application of New Case Authority**


In his Second Ground for Relief, Petitioner claims his "Due Process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution were violated when the state appellate court affirmed his convictions by retroactively applying new constructions of the elements of rape."  (Reply, ECF No. 18, PageID 1981.)

The Return of Writ interprets Ground Two as raising only a state law question:  did the Second District properly interpret Ohio rape law?  But that is not the claim Petitioner raises. Instead he claims the Second District fashioned a new definition of the elements of rape and then applied it retroactively to Petitioner's conduct in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments.

The Second District certainly did not think it was creating new interpretations of the rape statute's elements and the Magistrate Judge's review of its decision in analyzing the First Ground for Relief did not reveal any such new law.  To summarize, the force necessary to prove rape must be more than the force inherent in the sexual conduct at issue.  The force element can be proved by showing actual physical force or the threat of such force.  Regardless of how the force is proved,

24

the State must prove the force or threat was done to overcome the will of the victim and it must be shown to have been effective, to actually have caused the victim to submit.  Petitioner keeps insisting that the state of mind of the victim is irrelevant, but for the reasons given with respect to Ground One, the Magistrate Judge disagrees.

Petitioner is correct that a change in case law can be sufficiently extreme that its application to past conduct violates the Due Process Clause.  In *Bouie v. City of Columbia*, 378 U.S. 347 (1964) the Supreme Court struck down as unconstitutional a new judicial construction of a trespass statute which applied it to persons who failed to leave a store after notice, as opposed to the prior construction, in which it applied only to those who received notice prior to entry.  In *Bouie*, the South Carolina Supreme Court had, by a new interpretation of the trespass statute which it applied retrospectively, made criminal conduct which was innocent when it was done:  remaining in a place of public accommodation after being asked to leave when one had had no notice before entering the store that one was unwanted.  That is the most radically unfair sort of retrospective state action:  criminalizing primary conduct when it is too late for the subject to conform his conduct to the prohibition.

However, in *Rogers v. Tennessee*, 532 U.S. 451 (2001), the Court distinguished *Bouie* and held that the Due Process Clause does not incorporate to state judicial decisionmaking all the restrictions imposed on state legislatures by the *Ex Post Facto* Clause.  In *Rogers* the Tennessee Supreme Court, as an act of common-law lawmaking, (1) abolished the common-law rule that the death of an assault victim within a year and a day after the assault is a prerequisite to a homicide prosecution and (2) applied the abolition to uphold the murder conviction in that case where death occurred fifteen months after the assault.  The United States Supreme Court upheld the conviction,

holding that the retroactive abolition of the year-and-a-day rule did not violate Rogers' due process

rights. In *Rogers*, the Court described the situations to which it had applied *Bouie*:

> Those decisions instead have uniformly viewed *Bouie* as restricted to its traditional due process roots. In doing so, they have applied *Bouie's* check on retroactive judicial decisionmaking not by reference to the *ex post facto* categories set out in *Calder* [*v. Bull,* 3 Dall. 386, 1 L. Ed. 648 (1798)], but, rather, in accordance with the more basic and general principle of fair warning that *Bouie* so clearly articulated. See, e.g., *United States v. Lanier*, 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) ("Due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope"); *Marks v. United States*, 430 U.S. at 191-192 (Due process protects against judicial infringement of the "right to fair warning" that certain conduct will give rise to criminal penalties); *Rose v. Locke*, 423 U.S. 48, 53, 96 S.Ct. 243, 46 L.Ed.2d 185, (1975) (*per curiam*) (upholding defendant's conviction under statute prohibiting "crimes against nature" because, unlike in *Bouie*, the defendant "[could] make no claim that [the statute] afforded no notice that his conduct might be within its scope"); *Douglas v. Buder*, 412 U.S. 430, 432, 93 S.Ct. 2199, 37 L.Ed.2d 52 (1973) (*per curiam*) (trial court's construction of the term "arrest" as including a traffic citation, and application of that construction to defendant to revoke his probation, was unforeseeable and thus violated due process); *Rabe v. Washington*, 405 U.S. 313, 316, 2 S.Ct. 993, 31 L.Ed.2d 258, 9 (1972) (*per curiam*) (reversing conviction under state obscenity law because it did "not give fair notice" that the location of the allegedly obscene exhibition was a vital element of the offense).

532 U.S. at 460.

In *Metrish v. Lancaster*, 569 U.S. 351 (2013), the Supreme Court held it was not an

unreasonable application of *Bouie* and *Rogers* to retroactively apply the Michigan Supreme

Court's abolition of the Michigan diminished capacity defense on a re-trial, although it had been

available on the first trial.

To prove the Second District changed the law, Hartman cherry-picks phrases from its

decision. He claims that the court changed the purposely element to mean "purposely induced fear in the victim." (Reply, ECF No. 18, PageID 1985) Read in the context of the facts of this case and the decision as a whole, the Second District applied the previously established meaning of the statute: a defendant must by means of force (actual physical force) have compelled the victim to submit sexually, not just to have been afraid in some inchoate fashion.

Petitioner's Second Ground for Relief is without merit.


**Ground Three: Constitutionally Insufficient Indictment**


In his Third Ground for Relief, Petitioner asserts his rights under the Fifth and Fourteenth Amendments of the United States Constitution were violated when he was tried on an indictment that is constitutionally insufficient because it failed to ensure that the trial proceeded on the basis of the Grand Jury's findings, failed to give notice of the charges, and failed and continues to fail to shield him from subsequent prosecution for the same offenses (Reply, ECF No. 18, PageID 1986-2001).

Respondent asserts Ground Three is procedurally defaulted by Hartman's failure to raise it in the trial court as required by Ohio R. Crim P. 12(C)(2)(Return, ECF No. 6, PageID 1127).

The procedural default doctrine in habeas corpus is described by the Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or

demonstrate that failure to consider the claims will result in a
fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406

(6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional rights

claim he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S.

72 (1977); *Engle v. Isaac*, 456 U.S. 107, 110 (1982). "Absent cause and prejudice, 'a federal

habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal

habeas corpus review.'" *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000), quoting *Gravley v.*

*Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle*,

456 U.S. at 110; *Wainwright*, 433 U.S. at 87.

> [A] federal court may not review federal claims that were
> procedurally defaulted in state court—that is, claims that the state
> court denied based on an adequate and independent state procedural
> rule. E.g., *Beard v. Kindler*, 558 U.S. 53, 55, 130 S.Ct. 612, 175
> L.Ed.2d 417 (2009). This is an important "corollary" to the
> exhaustion requirement. *Dretke v. Haley*, 541 U.S. 386, 392, 124
> S.Ct. 1847, 158 L.Ed.2d 659 (2004). "Just as in those cases in which
> a state prisoner fails to exhaust state remedies, a habeas petitioner
> who has failed to meet the State's procedural requirements for
> presenting his federal claims has deprived the state courts of an
> opportunity to address" the merits of "those claims in the first
> instance." *Coleman* [*v. Thompson*], 501 U.S. [722,] 731-732, 111
> S.Ct. 2546, 115 L.Ed.2d 640 [(1991)]. The procedural default
> doctrine thus advances the same comity, finality, and federalism
> interests advanced by the exhaustion doctrine. See *McCleskey v.*
> *Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).

*Davila v. Davis*, 137 S.Ct. 2058, 2064 (2017).

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a

habeas claim is precluded by procedural default. *Barton v. Warden, S. Ohio Corr. Facility,* 786

F.3d 450, 464 (6th Cir. 2015), *Guilmette v. Howes,* 624 F.3d 286, 290 (6th Cir. 2010)(*en banc*);

28

*Eley v. Bagley*, 604 F.3d 958, 965 (6th Cir. 2010); *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594, 601-02 (6th Cir. 2001); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>                     . . . .
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord*, *Hartman v. Bagley,* 492 F.3d 347, 357 (6th Cir. 2007), quoting *Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002). A habeas petitioner can overcome a procedural default by showing cause for the default and prejudice from the asserted error. *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015).

Hartman asserts that no procedural default exists or, alternatively, that it was ineffective assistance of trial counsel to fail to raise this issue at trial and this ineffective assistance excuses any procedural default (Reply, ECF No. 18, PageID 1986). Hartman asserts he raised this claim as his Eleventh Assignment of Error on direct appeal. *Id.* The Second District decided this assignment as follows:

[*P63] For his Eleventh Assignment of Error, Hartman asserts:

29

## THE INDICTMENT IS CONSTITUTIONALLY INSUFFICIENT

[\*P64] For each of the three charges of rape, the indictment states:

> Mark Hartman, on or about December 31, 2013 in the County of Montgomery, aforesaid and the State of Ohio, did engage in sexual conduct with another, by purposely compelling the other person to submit by force or threat of force; contrary to the form of the statute (in violation of Section 2907.02(A)(2) of the Ohio Revised Code) in such case made and provided, and against the peace and dignity of the State of Ohio.

[\*P65] The language of the indictment charging Hartman with three counts of Rape does contain all the elements of the Rape statute, R.C. 2907.02(A)(2). The Supreme Court of Ohio has held that " [a]n indictment meets constitutional requirements if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *State v. Childs*, 88 Ohio St.3d 558, 565, 2000 Ohio 425, 728 N.E.2d 379 (2000), quoting *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). In *Childs*, the Court recognized that an indictment is generally acceptable if citing the actual language of the statute, unless it inadequately notifies the defendant of the charge and the severity of the penalty. More recently, in *State v. Jackson*, 134 Ohio St.3d 184, 2012-Ohio-5561, 980 N.E.2d 1032, the Supreme Court of Ohio confirmed this holding and found that a charge for aggravated trafficking was sufficient, without listing the specific drug involved, as long as the indictment identified the statutory schedule, I through V, in which the drug was listed as it made a difference to the severity of the penalty. *Id.* at P 21. Hartman alleges that the indictment is insufficient because it does not identify the name of the victim, and does not identify the nature of the sexual conduct for each of the three charges. Hartman argues that without these specifics, the indictment fails to adequately notify him of the charges against him, and subjects him to the possibility of additional charges, which would impair his protection from a potential Double Jeopardy violation.

[\*P66] The Supreme Court of Ohio has held that when an objection to an indictment is not raised prior to trial as required by Crim. R. 12(C)(2), it is waived, unless it constitutes plain error.

*Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, P 26, citing *State v. Frazier*, 73 Ohio St.3d 323, 332, 1995 Ohio 235, 652 N.E.2d 1000 (1995). According to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error is not found unless it can be concluded that but for the error, the outcome of the trial would have been different. *State v. Waddell*, 75 Ohio St.3d 163, 166, 1996 Ohio 100, 661 N.E. 2d 1043 (1996). Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Haney*, 12th Dist. Clermont No. CA2005-07-068, 2006-Ohio-3899, P 50, quoting *State v. Long,* 53 Ohio St.2d 91, 372 N.E. 2d 804 (1978), paragraph three of the syllabus.

[*P67] As we concluded above, since the name of the victim was undisputed, Hartman was not harmed by the failure to identify the name of the victim in the indictment. We have held that the indictment in a rape case with multiple counts "was sufficient because it paralleled the language of the statutes, including every element of each charge. Because the nature of the sexual acts had no bearing on the identity or severity of the offenses, the specific acts were not essential elements of the crimes and therefore were not required to be set forth in the indictment." *State v. Shaw*, 2d Dist. Montgomery No. 21880, 2008-Ohio-1317, P 20.

[*P68] Although the failure to identify the nature of the sexual conduct, in this case, does not affect the severity of the penalty for Rape, it does raise potential Double Jeopardy concerns. For example, Hartman admitted that he engaged in both oral and anal intercourse with the victim, but the State did not attempt to prosecute either of these potential offenses in the present case. In closing arguments, the State argued that the first count of Rape was supported by evidence of digital penetration, and the second and third counts were supported by evidence of penile penetration. Trial Transcript at 494. However, in the entry overruling the motion for a new trial, the trial court stated that all three counts were proven by penile penetration. Under the facts of this case, without identifying the specific sexual conduct in the language of the indictment, the State might consider pursuing a second prosecution for the digital penetration or the oral or anal intercourse. As we concluded in *Shaw, supra,* the failure of the indictment to notify the defendant of the nature of the sexual conduct upon which each of his convictions were based prevents a retrial for any of the potential offenses that occurred during the same time span covered by the indictment. *Id.*

at P 25. As addressed by the Supreme Court of Ohio in *State v. Anderson,* 138 Ohio St. 3d 264, 2014-Ohio-542, P 59, 6 N.E. 3d 23, the proper time for raising a Double Jeopardy violation is after a second indictment is issued and a motion to dismiss the indictment is decided. We cannot find that the potential for a future Double Jeopardy problem is grounds for reversal of a conviction that does not involve a current Double Jeopardy violation. In other words, we cannot conclude that but for the defective indictment error, the outcome of this trial would have been different. We conclude that failure to object to the indictment prior to trial, in accordance with Crim. Rule 12, waived this error on appeal. Consequently, Hartman's Eleventh Assignment of Error is overruled.

*Hartman*, 2016-Ohio-2883.

Hartman argues that because the Second District offered a "reasoned elaboration of the issue under federal law, there has been a merits ruling on the claim." (Reply, ECF No. 18, PageID 1988, relying on *Stewart v. Trierweiler*, 867 F.3d 633 (6th Cir. 2017).(Sutton, J.)[7] In *Stewart*, Judge Sutton wrote:

> At the outset, we must referee a dispute about whether AEDPA deference applies to these rulings given that the state court reviewed some of these claims for plain error. Our circuit has not been a paragon of clarity about whether a state court's plain-error ruling amounts to a ruling on the merits under AEDPA. See *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 851 (6th Cir. 2017). In 2009, we held that AEDPA applies to a state court's plain-error analysis if it "conducts any reasoned elaboration of an issue under federal law." *Fleming v. Metrish*, 556 F.3d 520, 531 (6th Cir. 2009). But in 2014, we said that "plain-error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference." *Frazier v. Jenkins,* 770 F.3d 485, 496 n.5 (6th Cir. 2014).
>
> Both rulings cannot be right, as they look in opposite directions. *Trimble v. Bobby,* 804 F.3d 767, 777 (6th Cir. 2015). To resolve this Janus-like dilemma, we look to the oldest decision on point. See *United States v. Abboud*, 438 F.3d 554, 567 (6th Cir. 2006). That is *Fleming*. If that weren't enough, our sister circuits sing with one voice on this issue—relying, in part, on our earlier decision. See,

---

[7] In the Reply, which is 164 pages long, the name of this case is misspelled as "Stewar*d* v. Trierweiler" and the citation is given as 667 F.3d 633 three times at PageID 1987-88.

> e.g., *Lee v. Comm'r, Ala. Dep't of Corr.,* 726 F.3d 1172, 1207-10 (11th Cir. 2013); *Rolan v. Coleman*, 680 F.3d 311, 319-21 (3d Cir. 2012); *Douglas v. Workman*, 560 F.3d 1156, 1177-79 (10th Cir. 2009).
>
> Stewart tries to sidestep this conclusion on the ground that *Fleming* failed to respect earlier circuit decisions. But he misreads the decisions. They stand only for the proposition that a state court's plain-error analysis cannot resurrect an otherwise defaulted claim. *Fleming*, 556 F.3d at 530.
>
> Confirming this conclusion is *Harrington v. Richter*. It obligates us to "presume[] that the state court adjudicated the claim on the merits" in ambiguous situations. 562 U.S. 86, 99, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

867 F.3d at 638.

Hartman misreads *Stewart*. The penultimate paragraph quoted above reaffirms the well-established rule that plain error analysis is an enforcement rather than a waiver of procedural default in the trial court. *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Jells v. Mitchell,* 538 F.3d 478, 511 (6th Cir. 2008); *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006); *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010)(en banc); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001), *citing Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)(plain error review does not constitute a waiver of procedural default); *accord, Mason v. Mitchell,* 320 F.3d 604, 635 (6th Cir. 2003), quoting *Hinkle*, *supra*. However, the opinion of a state court on plain error review is still entitled to AEDPA deference if the federal court reaches the merits despite the procedural default. *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009); *Kittka v. Franks*, 539 Fed. Appx. 668, 672 (6th Cir. 2013); *Bond v. McQuiggan*, 506 Fed. Appx. 493, 498 n. 2 (6th Cir. 2013); *Stojetz v. Ishee*, 2014 U.S. Dist. LEXIS 137501 *231 (S.D. Ohio Sept. 24,

2014)(Frost, D.J.). *Stewart* reaffirms the authority of *Fleming*.

The Second District's decision in this case recognized that Hartman was raising two constitutional claims about the indictment, to wit, that it failed to provide him with adequate notice of the allegations against which he must defend himself and that it failed to provide him with an adequate means of pleading once in jeopardy if he were reindicted for an sexual conduct with Molly Weckesser on December 31, 2013. The appellate court ruled on both of those claims. It found them both waived by failure to raise them under Ohio R. Crim. P. 12(C)(2), but it also provided a merits analysis.

Hartman first attacks the waiver analysis (Reply, ECF No. 18, PageID 1988-93). He asserts, correctly, that the State must satisfy the *Maupin* test to establish a procedural default. *Id.* at 1988. He then claims that "Ohio law allows defects in an indictment to be raised on direct appeal." *Id.* at PageID 1989, citing *State ex rel. Bandarapalli v. Gallagher*, 128 Ohio St.3d 314 (2011); *State v. Cimpritz*, 158 Ohio St. 490 (1953), paragraph six of the syllabus; *State v. Childs*, 88 Ohio St.3d 194 (2000); and *State v. Culp*, 32 Ohio App. 2d 39, 46, 288 N.E.2d 308, 314 (1971).

*Bandarapalli* was a prohibition case brought directly in the Supreme Court of Ohio. The court denied the writ because, it held, "Bandarapalli has adequate remedies in the ordinary course of law by motion to dismiss the indictment and, in the event he is convicted based on the alleged defective indictment, by appeal." Thus, the opinion does not address whether the issue could be raised on appeal if it had not been previously raised by motion to dismiss. In *Cimpritz*, the court had held that a judgment of conviction based on an indictment which does not charge an offense is void under Ohio law for lack of jurisdiction of the subject matter, and that it may be successfully attacked either on direct appeal to a reviewing court or by a collateral proceedings. However, in

*Midling v. Perrini*, 14 Ohio St. 2d 106 (1968), cited as good law in *Bandarapilla*, the Ohio Supreme Court held the failure to object to an indictment that does not state an offense must be raised in the trial court and cannot be raised for the first time on appeal because it does not deprive the trial court of subject matter jurisdiction. See also *State v. Burkitt,* 84 Ohio App. 3d 214 (Ohio App. 2nd Dist. 1993); *State v. Cochran*, 1995 Ohio App. LEXIS 5809 (Ohio App. 2nd Dist. Dec. 29, 1995).

In *Childs* the Ohio Supreme Court affirmed a Second District dismissal of an indictment without discussing the issue of waiver by failure to object in the trial court. *Culp* was decided in 1971 before the Ohio Rules of Criminal Procedure were adopted and cannot stand as authority that Rule 12 is not enforced.

Having reviewed the case law cited by Hartman, the Magistrate Judge concludes that the rule requiring objections to an indictment to be made first in the trial court is "firmly established and regularly followed." *Walker v. Martin,* 562 U.S. 307, 316 (2011). The Second District also actually relied on the rule in this case.

Hartman next argues that the rule requiring a trial court challenge to an allegedly deficient indictment is not "adequate and independent" as required by *Maupin*. The Magistrate Judge agrees with Hartman that this is a question of federal law. *Cone v. Bell,* 556 U.S. 449 (2009), citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991), and *Lee v. Kemna*, 534 U.S. 362, 375 (2002).

"Adequacy" turns on the state interest protected by the rule. *Maupin*, 785 F.2d at 138, citing *Henry v. Mississippi,* 379 U.S. 443, 446-48 (1965). States have a very strong interest in the contemporaneous objection rule. *Scott v. Mitchell,* 209 F.3d 854 (6th Cir. 2000), quoting extensively from *Wainwright v. Sykes,* 433 U.S. 72, 88-90 (1977). It is an adequate and

independent state ground. *Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell,* 209 F.3d 854 (6th Cir. 2000), citing *Engle v. Isaac*, 456 U.S. 107, 124-29 (1982). Ohio R. Crim. P. 12 serves the same state interests as the contemporaneous objection rule – allowing correction of errors when they first occur and before they infect a verdict. It also protects the State's interest in the finality of criminal judgments. The Magistrate Judge concludes Rule 12(C)(2) is adequate within the meaning of the *Maupin* test.

Hartman next asserts the rule is not independent of federal law. "Because federal Due Process requires that the accused be informed of the charges, any rule prohibiting review of the denial of such federally required notice is not independent of the federal Due Process requirement. (Reply, ECF No. 18, PageID 1992). However, Hartman provides no analysis of the "independence" criterion and cites no authority for this very broad proposition.

Determination of whether a state procedural ground is independent is a federal question that the federal court itself must decide. *Henry v. Mississippi,* 379 U. S. 443, 447 (1965); *Abie State Bank v. Weaver,* 282 U.S. 765, 773 (1931).

> When . . . a state court decision fairly appears to rest on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.

*Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983). "If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision." *Florida v. Powell*, 559 U.S. 50, 57 (2009), quoting *Michigan v. Long*, 463 U.S. 1032 at 1041 (1983).

The Second District's decision on whether Hartman had forfeited[8] his defective indictment claim by not raising it in the trial court is "clearly and expressly" based on the Ohio Rules of Criminal Procedure.

Thus, Respondent has established that Hartman procedurally defaulted his defective indictment claim. Hartman rejoins that he can show excusing cause and prejudice and has done so in explicating his Fourth Ground for Relief (Reply, ECF No. 18, PageID 1993). The reader is referred to the analysis of that Ground, *infra*.

Even without excusing cause and prejudice, a habeas court can reach the merits of a claim if failure to do so would work a "manifest injustice." To invoke that exception, Hartman relies on his claim that he is actually innocent of the crimes of which he was convicted and reiterates his own trial testimony that Weckesser was a willing participant in the sexual conduct which occurred (Reply, ECF No. 18, PageID 1993-94).

However, to qualify for the manifest injustice/actual innocence "gateway," a habeas petitioner must present new evidence of innocence. In *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005), the Sixth Circuit held:

> [I]f a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup v. Delo,* 513 U.S. 298, 316 (1995)." Thus, the threshold inquiry is whether "new facts raise[] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id*. at 317. To establish actual innocence, "a petitioner must show that it is more

---

[8] Although Ohio Rule 12 uses the word "waiver," the correct analysis is that the claim was forfeited. The Supreme Court relied on the distinction in *Wood v. Milyard*, 566 U.S. 463, 470 n.4 (2012) ("We note here the distinction between defenses that are 'waived' and those that are 'forfeited.' A waived claim or defense is one that a party has knowingly and intelligently relinquished; a forfeited plea is one that a party has merely failed to preserve. *Kontrick v. Ryan*, 540 U.S. 443, 458, n. 13 (2004); *United States v. Olano,* 507 U.S. 725, 733 (1993).).

> likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id*. at 327. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 140 L.Ed.2d 828, 118 S.Ct. 1604 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id.* at 321.

395 F.3d at 590.  Hartman presents no new evidence of his innocence and thus does not qualify for the "gateway."  His defective indictment claim is therefore procedurally defaulted.

Alternatively, the claim is without merit.  When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court.  28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Brown v. Payton*, 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000). Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

As noted above, the Second District made a reasoned analysis of both the fair notice and Double Jeopardy branches of Hartman's claim.  The Magistrate Judge evaluates those in turn.

Regarding the fair notice requirement, the Second District held an indictment is sufficient if made in the terms of the statute and advised the defendant of the charges against which he must defend.  *Hartman*, 2016-Ohio-2883 at ¶ 65, relying on *Childs* which in turn relied on *Hamling v.*

38

*United States*, 418 U.S. 87 (1974).  Hartman had claimed "that the indictment is insufficient because it does not identify the name of the victim, and does not identify the nature of the sexual conduct for each of the three charges.  Hartman argues that without these specifics, the indictment fails to adequately notify him of the charges against him."  The Second District found that the name of the alleged victim was uncontested and that the indictment was sufficiently specific about the manner of commission of the rapes because rape by oral, anal, or penile penetration all carried the same penalty, relying by analogy on charging trafficking in drugs on different controlled substances schedules as the Supreme Court of Ohio had done in *State v. Jackson,* 134 Ohio St.3d 184 (2012), and its own precedent in *State v. Shaw,* 2008-Ohio-1317, P 20 (2nd Dist. 2008).

Hartman argues this decision is an unreasonable application of clearly established federal law as decided by the United States Supreme Court (Reply, ECF No. 18, PageID 1994-97, relying on, *inter alia, Cochran and Sayre v. United States*, 157 U.S. 286, 290 (1895); *United States v. Simmons,* 96 U.S. 360, 362 (1878); *United States v. Carll,* 105 U.S. 611, 612 (1882); *United States v. Hess,* 124 U.S. 483, 487 (1888); and *United States v. Cruikshank,*[9] 92 U.S. 542, 558 (1876)). More contemporary and controlling authority is also cited, to wit, *Russell v. United States,* 369 U.S. 749 (1962), and *Hamling v. United States*, 418 U.S. 87 (1974).  Because there is recent authority in point, the Magistrate Judge declines to analyze the nineteenth century authority cited since it comes from an era of much more technical pleading rules in general and decisions of the Supreme Court were often on writ of error.

"[T]here is no constitutional right in a state prosecution to a grand jury indictment with

---

[9] *Cruikshank* arose from the Colfax Massacre of 1873 in which an armed mob of white men stormed a Louisiana courthouse and murdered scores of black men.  The Supreme Court found the indictment defective because it did not expressly allege a racial motive.  Its citation in Hartman's Reply instances the aphorism that even the devil can quote Scripture to his purposes.

particular specificity." *Williams v. Haviland*, 467 F.3d 527, 534 (6th Cir. 2006), citing *Rose v. Mitchell*, 443 U.S. 545, 557, n.7 (1979). "Due process mandates only that the indictment provide the defendant with 'fair notice of the charges against him to permit adequate preparation of his defense.'" *Williams*, *supra* at 535, quoting *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984).

*Russell v. United States*, 369 U.S. 749 (1962), holds the sufficiency of an indictment is to be measured by the following criteria:

> first, whether the indictment "contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet,'" and, secondly, "'in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.'"

369 U.S. at 763-64. While the right to grand jury indictment has not been extended to the States, the Sixth Circuit has held these criteria are applicable as a matter of due process. *Valentine v. Konteh*, 395 F.3d 626, 631 (6th Cir. 2005), citing *De Vonish v. Keane*, 19 F.3d 107, 108 (2nd Cir. 1994); *Fawcett v. Bablitch*, 962 F.2d 617, 618 (7th Cir. 1992); see also *Isaac v. Grider*, 211 F.3d 1269 (6th Cir. 2000).

The Second District's decision relied on *Childs* which in turned relied on *Hamling* which in turn recited the requirements from *Russell*. Thus, it is fairly read as having decided the federal issues presented here. *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The Magistrate Judge is not persuaded that the Second District's decision was an unreasonable application of *Russell* or *Hamling*. The indictment stated the elements of the offenses in the language of the statute and gave Hartman notice of the date these offenses allegedly occurred and the potential severity of the punishment. This is not a case like *Valentine* where the offenses allegedly occurred over an extended period of time.

The Second District recognized that the failure of the indictment to specify which sexual conduct was alleged to be at issue could potentially present a Double Jeopardy problem because Hartman had admitted to digital, oral, and anal penetration, albeit claiming they were consensual, and his conviction based on three instances of penile/vaginal penetration could in theory leave him open to prosecution for the other conduct. *Hartman*, 2018-Ohio-2883 at ¶ 68. The Double Jeopardy problem was only potential, however, because binding Ohio precedent would prohibit conviction for such conduct. *Id.* Moreover, no Double Jeopardy claim would be ripe until and unless the State reindicted Hartman. *Id.* Ohio courts consider a denial of a motion to dismiss on double jeopardy grounds to be a final appealable order, *State v. Anderson*, 1138 Ohio St.3d 264, 274-75 (2014), and as such would be immediately appealable in the state court and, if affirmed, subject to federal habeas corpus review.

Hartman analogizes his case to *Valentine*. There the defendant had been convicted on twenty "carbon-copy" rape counts and twenty such felonious sexual penetration counts and sentenced to forty consecutive life sentences. The District Court granted habeas relief on all forty counts on grounds the indictment was not definite enough. While the Sixth Circuit affirmed relief on thirty-eight of the counts, it allowed to stand life sentences on one count of each crime where the time period alleged was "March 1, 1995, to January 1, 1996" and the act alleged was digital penetration of the anus or the vagina. The testimony at trial was not of digital penetration, but of forced fellatio and anal intercourse. *Valentine* does not support relief in this case.

The Magistrate Judge concludes Hartman's Third Ground for Relief is barred by his procedural default in presenting it to the Ohio courts and alternatively on the merits. It should therefore be dismissed.

**Ground Four:   Ineffective Assistance of Trial Counsel:   Failure to Move to Dismiss Indictment**

In his Fourth Ground for Relief, Hartman claims he received ineffective assistance of trial counsel when his trial attorney failed to move to dismiss the defective indictment.

The governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.   First, the defendant must show that counsel's performance was deficient.   This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.   Second, the defendant must show that the deficient performance prejudiced the defense.   This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.   Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.  In other words, to establish ineffective assistance, a defendant must show both

deficient performance and prejudice.  *Berghuis v. Thompkins,* 560 U.S. 370, 389 (2010), citing

*Knowles v. Mirzayance,* 556 U.S.111 (2009).

> With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> > Judicial scrutiny of counsel's performance must be highly deferential. . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance;  that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

> As to the second prong, the Supreme Court held:

> > The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.  See also *Darden v. Wainwright*, 477 U.S. 168, 184 (1986), citing *Strickland,*

*supra.*; *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998), citing *Strickland, supra*; *Blackburn v.*

*Foltz*, 828 F.2d 1177, 1180 (6th Cir. 1987), *quoting Strickland,* 466 U.S. at 687. "The likelihood of

a different result must be substantial, not just conceivable."  *Storey v. Vasbinder*, 657 F.3d 372,

379 (6th Cir. 2011), quoting *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011).

> On direct appeal, Hartman alleged ineffective assistance of trial counsel in Assignments of

Error IV, V, VI, VII, VIII, and IX.  The claim brought forward in Ground Four was Assignment

V which Second District decided as follows:

[*P47] We also conclude that Hartman was not denied the assistance of effective counsel when defense counsel failed to file a motion to dismiss the indictment. The indictment charging Hartman with three counts of Rape did contain all the elements of the offenses set forth in the Rape statute, R.C. 2907.02(A)(2). Although the indictment did not include the name of the victim and the nature of the sexual conduct, the name of the alleged victim was never in question, and the nature of the sexual conduct would have been available to defense counsel by moving for a bill of particulars.

*Hartman,* 2016-Ohio-2883. The court had previously acknowledged that *Strickland* provided the governing standard. *Id.* at ¶ 45.

Because the indictment was not defective in the ways alleged, as both the Second District and the Magistrate Judge have found, it was not ineffective assistance of trial counsel to fail to raise the claim by motion to dismiss. Although this failure defaulted consideration of the claim on the merits on direct appeal and here, Hartman received that consideration in the alternative and was not prejudiced by failure to file a motion to dismiss. The Second District's decision on Assignment of Error V is not an objectively unreasonable application of *Strickland*, so Ground Four should be dismissed.

**Ground Five:   Ineffective Assistance of Trial Counsel:   Failure to Move for a Bill of Particulars**

In his Fifth Ground for Relief, Hartman asserted he received ineffective assistance of trial counsel when his trial attorney failed to move for a bill of particulars. As with Ground Four, Respondent defends this claim on the merits, asserting the Second District's decision on this claim is entitled to deference under AEDPA (Return of Writ, ECF No. 6, PageID 1164 *et seq.*).

Hartman presented this claim as his Sixth Assignment of Error on direct appeal and the Second District decided it as follows:

44

> While it may be argued, again from hindsight, that defense counsel should have moved for a bill of particulars, Hartman has not established that he was prejudiced by counsel's failure to do so. In his written statement, and in his trial testimony, Hartman admitted engaging in a sexual encounter that included digital penetration, vaginal, anal and oral intercourse with M.W., so disputing that sexual conduct occurred was not part of his defense. To establish that he was prejudiced, Hartman would need to establish that but for counsel's failure to move for a bill of particulars, there is a reasonable probability that the outcome of the proceeding would have been different. As discussed above, the guilty verdicts in this case resulted from the trier of fact's decision to find the victim's testimony to be more credible. Under these circumstances, we conclude that the details provided by a bill of particulars would not have resulted in a reasonable probability of a different outcome.

*Hartman,* 2016-Ohio-2883 at ¶ 47.

The standard for deciding this claim, as with Ground Four, is provided by *Strickland*. The Second District did not discuss the performance prong at all. From this Hartman infers that "[i]t is clear that the Second District Court of Appeals found deficient performance in counsel's failure to move for a bill of particulars, thus satisfying the first prong of *Strickland*." (Reply, ECF No. 18, PageID 2011). The Magistrate Judge declines to infer such a "clear" finding from silence. The Supreme Court has sanctioned deciding a *Strickland* claim by deciding the prejudice prong alone. *Strickland*, 466 U.S. at 697.

Counsel's performance is measured by "prevailing professional norms" at the time of the alleged errors. *Strickland, supra,* at 690; *Maryland v. Kulbicki*, 577 U.S. ___, 36 S.Ct. 2, 4 (2015); *Rickman v. Bell*, 131 F.3d 1150, 1154 (6th Cir. 1997). As evidence of what those norms are, Hartman quotes ABA Standards for the Defense Function 4-3.6 and 4-4.1, but neither mentions requesting a bill of particulars. Nor does he cite any other authority holding that making such a request is mandatory practice in a case such as this. In a case like *Valentine* a bill of particulars would have been necessary to narrow dates, times, and places. But Hartman knew what sexual

conduct he had engaged in with Molly Weckesser, the only date when it occurred, the place where it occurred, who else might have been a witness, and so forth. As the Second District emphasized, this was a credibility contest and Hartman's decision, with the advice of counsel, looks even in hindsight to the Magistrate Judge as a good way to heighten Hartman's perceived credibility. While this would not have precluded also requesting a bill of particulars, the Second District's conclusion that Hartman was not prejudiced by the omission appears quite reasonable.

Hartman's Fifth Ground for Relief should therefore be dismissed.

**Ground Six: Ineffective Assistance of Trial counsel: Inept Cross-Examination of the Victim**

In his Sixth Ground for Relief, Hartman alleges he received ineffective assistance of trial counsel in the manner in which trial counsel cross-examined Molly Weckesser in that "counsel introduced evidence on elements of the offense that the state had failed to prove and sought and received inadmissible hearsay that bolstered the State's case all to the prejudice of Hartman."

Respondent defends this Ground on the merits, urging deference to the Second District's decision (Return, ECF No. 6, PageID 1166). Hartman raised this claim as his Seventh Assignment of Error on direct appeal and the Second District decided it as follows:

> [*P48] We agree with Hartman's assertion that defense counsel, on cross-examination of the victim, brought up factual matters not presented during the direct examination of the victim that may have helped the State prove the element of force. Specifically, the record reveals that defense counsel asked the victim to confirm that Hartman was "restraining" her, Trial Transcript at 74-75, that Hartman pinned her arms down, Trial Transcript at 75-76, that Hartman held his forearm across her chest, Hartman grabbed her wrists, grabbed her arm, and "was doing that forcefully," Trial Transcript at 80-81. We have held that "trial counsel's decision to cross-examine a witness and the extent of such cross-examination are tactical matters." *State v. Russell,* 2d Dist. Montgomery No.

21458, 2007-Ohio-137, P 55. "A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy." *State v. Conley*, 2015-Ohio-2553, P 56, 43 N.E.3d 775 (2d Dist.), citing *State v. Smith,* 17 Ohio St.3d 98, 17 Ohio B. 219, 477 N.E.2d 1128 (1985). "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *Id*., citing *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992). Because it was at least arguable that the State had presented sufficient evidence of force relating to at least one of the Rape counts — the last one occurring on the bed — trial counsel could reasonably have concluded that it would not be safe to eschew cross-examination on the element of force.

[*P49] It appears that the strategy of defense counsel asking the victim about facts relevant to the issue of force was an attempt to attack her credibility based on different versions of the events she provided to the sexual assault nurse, to the detective, and during direct examination at trial. In a case that rests entirely on the credibility of the witnesses, a strategic choice to conduct cross-examination of the victim on factual issues relating to elements of the offense is not automatically ineffective assistance of counsel. In the case before us, it was a valid defense strategy to attack the credibility of the victim through the use of prior inconsistent statements, a well-established trial strategy. See Evid. R. 613. We conclude that Hartman was not denied the effective assistance of counsel when reasonable trial strategy was utilized to challenge the victim's credibility through a cross-examination technique of raising inconsistent statements.

[*P50] Hartman also argues that his counsel was ineffective based on his failure to object to inadmissible hearsay from the testimony of the victim's friend, Courtney, the sexual assault nurse, and the detective who interviewed the victim at the hospital. With respect to the victim's friend, Courtney, Hartman claims that his counsel should have objected to inadmissible testimony regarding the character of the victim, including her demeanor immediately after the incident, and to specific statements made by the victim the following morning. While opinions elicited to prove that a victim is being truthful are generally inadmissible, a distinction has been made for testimony "which is additional support for the truth of the facts testified to by the [victim], or which assists the fact finder in assessing the [victim's] veracity." *State v. Sedgmer*, 7th Dist. Harrison No. 00 522 CA, 2002-Ohio-1527, P 23, citing *State v. Stowers,* 81 Ohio St. 3d 260, 1998 Ohio 632, 690 N.E. 2d 881 (1998). In the case before us, defense counsel did not err by failing

to object to testimony that was admissible to assist the trier-of-fact in assessing the victim's veracity.

[*P51] With respect to the sexual assault nurse, Hartman argues that counsel's failure to object to the nurse's inadmissible hearsay was prejudicial. The hospital's designated sexual assault nurse did testify as to statements made by the victim, after the victim had been examined by an ER doctor, so that at the time of the interview a medical diagnosis had already been completed. The nurse testified that her examination of the victim was to look for injury that could be consistent with force. Trial Transcript at 177-178. In response to the victim's statements, the sexual assault nurse took samples of the victim's DNA in order to complete a rape kit, which was to assist law enforcement, not for medical diagnosis. Ohio licensing law limits a registered nurse's role to assessing the patient for the purpose of providing nursing care, and a nursing diagnosis is limited to "identification of a patient's needs or problems which are amenable to nursing intervention." R.C. 4723.01; O.A.C. 4723-4-01. The victim's statements to a nurse about the cause and origin of the injury is inadmissible hearsay, unless "the inception or general character of the cause of external source thereof is reasonably pertinent to diagnosis or treatment." Evid. R. 803(4). The only statements made to a nurse by a victim that are admissible under Evid. R. 803(4) are statements made for the purpose of nursing diagnosis or treatment. Therefore, a nurse's testimony concerning statements made by a rape victim, recorded by the nurse for the purpose of assisting a criminal investigation, and not for nursing treatment or diagnosis, is inadmissible hearsay.

[*P52] In the case before us, the nurse did not testify that the victim had any injuries requiring nursing treatment, or that she provided treatment. Even though defense counsel failed to object to the nurse's testimony or the admission of the nurse's report, Ex. 20, we conclude that this was not sufficiently prejudicial to have affected the outcome of the trial. The verdicts rested on the credibility of the victim, and no part of the nurse's testimony was essential to the trier of fact's finding that all elements of the offense of Rape had been established through the victim's testimony. Therefore, we conclude that Hartman was not denied effective assistance of counsel by counsel's failure to object to the nurse's testimony.

[*P53] Hartman also argues that his counsel was ineffective by having failed to object to the hearsay evidence admitted through the testimony of the detective. The State concedes that it was hearsay when the detective testified regarding the statements made during his interview of the victim. The State does not argue that these

> statements were admissible through any exception to the hearsay rule, such as an excited utterance allowed by Evid. R. 803(2), or a present-sense impression under Evid. R. 803(1). The only question under this assignment of error is whether the admission of this hearsay was prejudicial. This question must be viewed in the same manner discussed above regarding the defense strategy to cross-examine the victim regarding prior inconsistent statements, which included the statements she made to the detective. As we have already concluded, it was a reasonable defense strategy to allow the admission of the victim's various statements of the incident in order to challenge the victim's credibility by pointing out inconsistencies in these pre-trial statements with her testimony at trial. We conclude that Hartman was not denied effective assistance of counsel as a result of counsel's strategic decision not to object to the detective's testimony in order to allow the admission of inconsistent statements by the victim.

*Hartman, supra.* To summarize, it was Hartman's trial strategy to undermine Weckesser's claim she was forced to have sex with him. To that end, it was not an unreasonable strategy to attempt to elicit potentially inconsistent statements Weckesser might have made shortly after the incident, to her friend, to the nurse, or to the detective.

Hartman argues, however, that failure to make these hearsay objections denied him effective assistance. As with Ground Five, he asserts that the Second District agreed with him that failure to make these hearsay objections was deficient performance (Reply, ECF No. 18, PageID 2017). Not so. Here, the Second District was silent on the deficiency prong and decided this Assignment of Error entirely on the prejudice prong.

To show deficient performance, counsel again quote the ABA Defense Standards, this Standard 4-5.2. *Id.* That standard does not begin to suggest that trial counsel perform deficiently if they do not object every time hearsay testimony is offered. Instead the Standard provides counsel should consult with the client on "whether and how to conduct cross-examination." Hartman never suggests, however, that his counsel did not consult with him about the scope of cross-examination.

Hartman rightly notes that counsel cannot escape examination of his or her conduct merely by labeling it "strategy."  (Reply, ECF No. 18, PageID 2018, citing *White v. McAninch,* 235 F.3d 988 (6th Cir. 2000.)  But there appears to have been an evident reasonable strategy at work here: admit the sexual conduct and claim it was consensual.  Hartman and his attorney did not wait for trial to begin to carry out that strategy, but made an early statement to that effect to the police.  This "I've got nothing to hide" approach would be consistent with allowing the friend, Courtney, the nurse, and the detective to testify without technically correct hearsay objections.

To the Magistrate Judge the trial context is also important.  The case was tried to the bench and was presided over by Judge Michael Tucker.  He was admitted to practice in 1980 and had an active trial practice before taking the bench.  He would have been well known to defense counsel at the time the decision was made to try the case to the bench.  Although the rules of evidence apply alike to jury and bench trials, they were largely developed both at common law and in their codified form to keep juries from hearing material that is unreliable or prejudicial.  Those concerns are far less important in a bench trial and indeed inadmissible evidence is presumed to be ignored by a judge in a bench trial.  *Harris v. Rivera*, 454 U.S. 339, 346 (1981)(*per curiam*); *Wickline v. Mitchell*, 319 F.3d 813, 823-24 (6th Cir. 2003).  Making technically correct hearsay objections could readily be seen as inconsistent with a defense strategy that proclaims loudly, "I've got nothing to hide."

Hartman's current counsel argue Weckesser did not testify to the use of force.  Therefore, they say, "At the close of direct examination, the State had failed to establish the element of force or threat of force.  The State having failed to establish an element of the offense, there should have been no cross-examination."  (Reply, ECF No. 18, PageID 2020.)  Provided Judge Tucker had been prepared to accept their analysis of the evidence at that stage of the case, they would be right.

But in a case where everything turned on whom Judge Tucker believed, it would have been a very risky approach to fail to cross-examine the complaining witness.

Hartman's Sixth Ground for Relief should be dismissed.


**Ground Seven:  Violation of the Confrontation Clause**


In his Seventh Ground for Relief Petitioner alleges his Sixth Amendment Confrontation Clause rights were violated when the trial court admitted the testimony of Mark Squibb in violation of *Crawford v. Washington*, 541 U.S. 36 (2004) (Petition, ECF No. 1, PageID 39).

Respondent asserts this Ground for Relief is procedurally defaulted because Hartman's trial counsel made no contemporaneous objection (Return, ECF No. 6, PageID 1129).

Noting that the Second District reviewed this claim for plain error but gave a merits analysis, Hartman again argues this is not enforcement of the contemporaneous objection rule, again misciting *Stewart, supra,* as *Stewar**d** v. Trierweiler,* **6**67 F.3d 633).  This argument is unpersuasive for the same reasons given respecting Ground Three, *supra.*

The relevant portions of the Second District's decision are as follows:

> [*¶18] . . .  The trial court conducted a hearing on the motion for a new trial, and accepted testimony from Mark Squibb, an employee of the Miami Valley Regional Crime Laboratory, and Detective Norris from the Oakwood Public Safety Department. During trial, Squibb was qualified as an expert in the field of DNA analysis. Squibb explained that the police gather evidence and submit it to the laboratory for testing. Each item or exhibit submitted for testing is given a submission number and a submittal sheet is filled out by the requesting agency identifying the item and the type of testing requested. Once submitted it is retained in a property room that is only accessible by individuals in the DNA section. When it is assigned to an analyst, that person will remove it from the evidence room, keep it in their care and custody, perform the testing, and then

the item is returned to the law enforcement agency that supplied the item. The DNA lab retains any samples found to contain DNA.

[*P19] Squibb was not the analyst who performed the screening or testing. Squibb conducted a technical review of the analyst's work, and testified from the contents of analyst's report. He did not inspect the comforter or conduct any part of the extraction or testing. At the post-trial hearing, Squibb testified that part of his review process was to review the case notes of the lab technician, but these notes had not been requested or provided to defense counsel. Emily Draper, who wrote the notes and performed the testing, did not testify at trial or at the post-trial hearing. The testing generated two Laboratory Reports, one on the rape kit and one on the comforter. Squibb's testimony revealed that the lab's approach is to first test the most probative evidence to confirm or deny that sexual activity has taken place, and if that test is positive, the testing on the remaining swabs are deferred until some action is initiated by someone to do further testing. The notes of Emily Draper were interpreted by Squibb to mean that after Hartman's DNA was matched with swabs from M.W.'s vagina, the lab did not test swabs taken from rectal, oral and underwear samples or the comforter. Squibb testified that the police originally requested testing on both the rape kit and the comforter, but once Hartman's DNA was found from the rape kit, they did not test the comforter until a later time after it was requested again. From the notes he reviewed, Squibb did not know who made that second request, or when it was made. Squibb testified that they had electronic records of the original submittal from the law enforcement agency and the subsequent request that caused the comforter to be tested, but he did not have those records and could not testify to their content. In response to questions by the trial court, Squibb also testified that he had personally added highlighting and other markings to the lab report to assist himself in his testimony.

         \* \* \*

[*P80] For his Fourteenth Assignment of Error, Hartman asserts:

THE ADMISSION OF MARK SQUIBB'S TESTIMONY IN VIOLATION OF *CRAWFORD V. WASHINGTON,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) REQUIRES REVERSAL

[*P81] Hartman argues that the admission of scientific evidence through a witness who did not conduct the scientific test is structural error. Convictions based on structural errors, which involve a constitutional "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself," are

subject to automatic reversal, regardless of whether harm or prejudice is shown. *Neder v. United States,* 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). The State argues that the expert's testimony was not hearsay, because the DNA expert testified to his own actions in performing a peer review of the actual lab technician's report. The State also argues that a confrontation clause violation, if any, was waived when the defense failed to object to the testimony of the DNA expert at trial. The State also argues that any error was harmless. As discussed below, **we conclude that our review of this assignment of error must be based on whether the error was waived or constitutes plain error (emphasis added).**

[*P82] For purposes of the confrontation clause, it has been held that the contents of a laboratory report is testimonial in nature when its conclusion is prima facie evidence of an element of the offense. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009); *Bullcoming v. New Mexico,* 564 U.S. 647, 663-664, 131 S.Ct. 2705, 2716, 180 L.Ed.2d 610 (2011). However, the U.S. Supreme Court has also held that expert testimony from a forensic specialist about the findings of a DNA test that was not performed by the witness did not violate the defendant's right to confrontation because the testimony was offered for the purpose of explaining the assumptions on which the expert's opinion relied, and were not offered for the truth of the assumptions. *Williams v. Illinois,* [567] U.S. [50], 132 S.Ct. 2221, 183 L.E.2d 89 (2012). See also *State v. Maxwell*, 139 Ohio St. 3d 12, 2014-Ohio-1019, P 42, 9 N.E.3d 930. In the case before us, Hartman challenges not only the admission of the lab reports, but his inability to cross-examine the witness who actually performed the DNA tests. The record supports that the DNA expert who did testify was unable to fully explain the reasoning for the process used to conduct the testing, which the witness did not conduct. "Fundamentally, the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court." *Melendez-Diaz v. Massachusetts*, 557 U.S. at 325. "[T]he [Confrontation] Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." *Bullcoming v. New Mexico*, 564 U.S. at 662.

[*P83] We agree that the record establishes that during trial, defense counsel did not object to the testimony of Squibb, the DNA expert, in place of Draper, the lab analyst who personally conducted the testing and interacted with the persons in law enforcement who requested the tests. We do not agree that counsel's failure to object

automatically constitutes a waiver of his Sixth Amendment right to confrontation. We acknowledge that the Supreme Court of Ohio in *State v. Pasqualone*, 121 Ohio St. 3d 186, 2009-Ohio-315, 903 N.E. 2d 270, held that confrontation clause rights, like other constitutional rights, can be waived. Although the Court in *Pasqualone* was addressing the potential error of admitting a laboratory report, without the testimony of the person who prepared the report, the holding in *Pasqualone* rests entirely on a statutory provision, R.C. 2925.51, that specifically provides that defense counsel statutorily waives the right to insist on the testimony of the lab technician, if the procedure specified by the statute is not followed. Inapplicable to the case before us, R.C. 2925.51 only applies to testing done on drugs, not DNA samples. The statute applicable to drug testing puts the defense on notice that they have a right and that it is waived if the procedure is not followed, which comports with the legal concept of waiver requiring a voluntary relinquishment of a known right. *In re B.N.C.*, 2d Dist. Montgomery No. 25615, 2013-Ohio-4071, P 49. The U.S. Supreme Court in *Melendez-Diaz, supra*, commented that state statutes, such as R.C. 2925.51, do not run afoul of the confrontation clause when the effect of the statute is only to establish the procedural timing of when the right must be exercised. In the case before us, the State identified Emily Draper as the witness it intended to call to introduce the lab report and the DNA analysis. Dkt. #40. The defense had no prior notice that it would waive the right to cross-examine the lab technician if she did not show up for trial. However, by failing to object at trial when the State called Squibb instead of Draper, Hartman waived all but plain error. "Where preserved by objection, review of Confrontation Clause claims is for harmless error. Confrontation Clause claims not preserved by objection are reviewed for plain error." *State v. Habo*, 11th Dist. Portage No. 2012-P-0056, 2013-Ohio-2142, P 35, citing *State v. Scott*, 10th Dist. Franklin No. 05AP-1144, 2006-Ohio-4981, P 11, fn. 4.

[*P84] By claiming structural error, Hartman essentially argues that on this record, without the testimony of the analyst, prejudice is presumed. We disagree. The purpose of the testimony of the DNA expert was twofold; first, it proved that Hartman engaged in sexual intercourse with M.W., because his semen was found from a vaginal swab taken from M.W.; and secondly, that DNA testing of the bed comforter proved that there was movement of the two bodies on the comforter, as DNA evidence was found in numerous different spots. Hartman testified at trial, and did not dispute that he had sexual intercourse with M.W., so he was not prejudiced by the admission of the DNA lab report or the testimony that explained the testing process. The evidence involving the comforter was also not

prejudicial, because it was not probative to any element of the charged offenses, and may actually have supported Hartman's defense that the encounter was consensual, based upon a reasonable inference that M.W. was not held down or restrained during the sexual encounter. In closing arguments, Hartman's counsel did suggest that the testimony of the DNA expert be given little weight because, "when swabs were taken from [M.W.]'s mouth, they weren't tested. So, there's aspects of the investigation that appear to be incomplete as well that could have helped us in this path as we look for the truth." Trial Transcript at 520. If Hartman's argument is based on the possibility of evidence that was not provided by the State, that potential error does not constitute a confrontation-clause violation. "The state has no duty to gather exculpatory evidence. Moreover, it is wholly speculative whether further investigation would have uncovered potentially exculpatory evidence." *State v. Smith*, 2d Dist. Montgomery No. 20247, 2005-Ohio-1374, P 12, citing *State v. Farris*, 2d Dist. Clark No. 2003 CA 77, 2004-Ohio-5980, P 20. The defendant bears the burden to show that the evidence not produced was materially exculpatory, or that the failure to produce the evidence was based on bad faith, in order to demonstrate a due-process violation. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, P 74-77. Since Hartman has not raised a due-process argument, the issue of whether the lab should have tested the full rape kit to provide potentially exculpatory evidence to the defense is not before us. Hartman has not established that there is a reasonable possibility that had he been able to cross-examine the lab analyst there would have been a great likelihood of a different outcome.

[*P85] Even without the testimony of the DNA analyst, the trier-of-fact had sufficient evidence to support each element of the charged offenses. Hartman has not established that but for a confrontation-clause error, the outcome of the trial would have been different. Accordingly, Hartman's Fourteenth Assignment of Error is overruled.

*Hartman,* 2016-Ohio-2883.

Forensic evidence gathered regarding this case consisted of a rape kit containing oral, vaginal, and anal swabs taken from Molly Weckesser the day after the sexual encounter and a comforter from the bed on which it happened. DNA extraction and analysis was performed at the Miami Valley Regional Crime Laboratory by Emily Draper who was listed as a trial witness by

the State. She did not, however, testify at either the trial or the hearing on the new trial motion. Instead, Mark Squibb, another employee of the Crime Lab, who testified he reviewed Draper's notes and testified as to their contents. While the Second District did not expressly hold that admission of Squibb's testimony violated the Confrontation Clause, it did so implicitly by proceeding to decide whether the Confrontation Clause claim had been waived[10] by failure to object. The Magistrate Judge agrees with Petitioner that there was a clear violation of the Confrontation Clause in the admission of some or all of the contents of Draper's expert DNA report without her being present for cross-examination. The Respondent does not contest this point.

As can be seen from the highlighted language, the Second District conducted a plain error analysis of Hartman's Confrontation Clause claim. In doing so it was enforcing Ohio's contemporaneous objection rule. Ohio's contemporaneous objection rule — that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (1998) — is an adequate and independent state ground of decision. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012), *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir. 2010); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Biros v. Bagley,* 422 F.3d 379, 387 (6th Cir. 2005); *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), citing *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), citing *Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See*

---

[10] Again, the distinction between waiver and forfeiture, explained above at note 8, is important here. Hartman never knowingly, intelligently, and voluntarily gave up ("waived") his right to insist on being able to cross-examine Draper. Whether he forfeited that right is a legally different question and the one that is relevant here.

*also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir. 2010).

Hartman argues here, as he did before the Second District, that admission of Squibb's testimony was a structural error. Errors of a structural nature cannot be harmless. *Arizona v. Fulminante*, 499 U.S. 279 (1991). To prove this was a structural error, Petitioner relies on language from *Bullcoming, supra*, that the State cannot satisfy a Confrontation Clause obligation by providing a substitute witness whose testimony provides "a fair enough opportunity from cross-examination." 564 U.S. at 662. Indeed, once the unconfronted witness's testimony has been presented, "no additional showing of prejudice is required to make the violation complete." *Id.* at 663. The same language appears in the prior case, *United States v. Gonzalez-Lopez,* 548 U.S. 140 (2006), which Petitioner also cites (Reply, ECF No. 18, PageID 2039). The Magistrate Judge is not persuaded this language amounts to a holding that Confrontation Clause violations amount to structural error.

> The Supreme Court has "found structural error only in a very limited class of cases." *Johnson v. United States,* 520 U.S. 461, 468 (1997). These structural errors include: total deprivation of the right to counsel, *Gideon v. Wainwright,* 372 U.S. 335 (1963); lack of an impartial trial judge, *Tumey v. Ohio*, 273 U.S. 510 (1927); unlawful exclusion of grand jurors of the defendant's race, *Vasquez v. Hillery,* 474 U.S. 254 (1986); denial of the right to self-representation at trial, *McKaskle v. Wiggins,* 465 U.S. 168 (1984); denial of the right to a public trial, *Waller v. Georgia*, 467 U.S. 39 (1984); and denial of the right to a jury verdict of guilt beyond a reasonable doubt, *Sullivan v. Louisiana,* 508 U.S. 275 (1993). In *United States v. Cronic,* 466 U.S. 648, 659 and n.25 (1984), the Supreme Court added to the list the denial of counsel at a "critical stage" of the criminal proceedings, entitling the defendant to a new trial without a specific showing of prejudice because the error makes "the adversary process itself presumptively unreliable." *See also Van v. Jones,* 475 F.3d 292, 311-12 (6th Cir.) (holding that a defendant is deprived of counsel at a critical stage, "a *per se* Sixth Amendment violation [results,] warranting reversal of a conviction, a sentence, or both, as applicable, without analysis for prejudice or harmless

> error"), *cert. denied*, 128 S.Ct. 708 (2007); *Roe v. Flores-Ortega*,
> 528 U.S. 470, 483 (2000).

*Hereford v. Warren*, 536 F.3d 523, 529 (6th Cir. 2008)(parallel citations omitted). "*Most* constitutional mistakes call for reversal only if the government cannot demonstrate harmlessness. . . . Only the rare type of error – in general, one that 'infect[s] the entire trial process' and 'necessarily render[s] [it] fundamentally unfair' requires automatic reversal." *Glebe v. Frost*, 574 U.S. 21, 23 (2014)(some internal quotation marks omitted), citing *Neder v. United States*, 527 U.S. 1, 8 (1999).

The Supreme Court has never found a Confrontation Clause violation to be structural error. In fact, it has applied harmless error analysis to Confrontation Clause claims. *Delaware v. Van Arsdall*, 475 U.S. 673 (1986). The Sixth Circuit has expressly and recently held that Confrontation Clause violations are subject to harmless-error analysis. *Reiner v. Woods*, ___ F. 3d ___, 2020 U.S. App. LEXIS 10838, *10-11 (6th Cir. Apr. 7, 2020), *Gover v. Perry*, 698 F.3d 295, 302 (6th Cir. 2012), citing *Vasquez v. Jones*, 496 F.3d 564, 574 (6th Cir. 2007); *Jensen v. Romanowski*, 590 F.3d 373, 379 (6th Cir. 2009). The Second District held that the Confrontation Clause claim here was to be reviewed for harmlessness. *Hartman*, 2016-Ohio-2883 at ¶ 83. It then analyzed the DNA evidence for prejudice. *Id.* at ¶¶ 84-85. In doing so, it applied the same tests required for harmless error analysis by *Van Arsdall*:

> "The *Van Arsdall* factors include: (1) "the importance of the witness' testimony in the prosecution's case," (2) "whether the testimony was cumulative," (3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," (4) "the extent of cross-examination otherwise permitted," and (5) "the overall strength of the prosecution's case."

*Gover*, quoting *Van Arsdall*, 475 U.S. at 684. Here the DNA evidence from the rape kit was not needed by the prosecution to prove Weckesser and Hartman had sex because he freely admitted it.

Indeed, DNA evidence from the comforter could have supported Hartman's theory that the sex was consensual because that evidence placed Weckesser's body at different places on the comforter.

The State defended this Assignment on the ground any error was harmless (Appellee Brief, State Court Record, ECF No. 5, PageID 313-14). Although the Second District used the language of "prejudice" rather than "harmless error," its lack of prejudice findings support the conclusion that the Confrontation Clause error was harmless when reviewed under the standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993): constitutional error is harmless if the habeas court is satisfied it did not have a "substantial and injurious effect or influence in determining the . . . verdict," *Brecht*, 507 U.S at 637-38, quoting and adopting standard from *Kotteakos v. United States*, 328 U.S. 750, 776 (1946). A federal court may grant habeas relief only if a constitutional violation had a "substantial and injurious effect or influence in determining the jury's verdict." *Williams v. Bauman*, 759 F.3d 630, 637 (6th Cir. 2014), quoting *Brecht*, 507 U.S. at 631. This standard calls for reversal when the reviewing court lacks a "fair assurance" that the outcome of a trial was not affected by evidentiary error. *Beck v. Haik*, 377 F.3d 624 (6th Cir. 2004). *Brecht* applies post-AEDPA "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967)." *Fry v. Pliler*, 551 U.S. 112, 114 (2007)(parallel citations omitted). A federal habeas petitioner "must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA" *Davis v. Ayala*, 576 U.S. 257, 135 S.Ct. 2187, 2199 (2015), citing *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007). "The Supreme Court and this court have made clear that '*Brecht* is always the test' for evaluating harmless error on collateral review, even where AEDPA applies. *Reiner*, 2020 U.S. App. LEXIS

10838 at *13-14, quoting *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411-12 (6th Cir. 2009).

Applying the *Brecht* standard, the Magistrate Judge concludes the error in admitting Mark Squibb's testimony had no injurious effect on the outcome of the trial.  Hartman's relies on Judge Tucker's conclusory statement that he "based the guilty verdicts on the evidence presented at trial." (Reply, ECF No. 18, PageID 2037, quoting Trial Transcript, State Court Record, ECF No. 7-1, PageID 1722-23.)  What Judge Tucker actually said was, "Going first to Count I of the indictment, I find, based upon the evidence presented, the applicable law and my assessment of witness credibility that the State of Ohio proved beyond a reasonable doubt all the essential elements of rape as charged in Count I of the indictment."  *Id*. at 1722.  He repeated the same pattern of language with respect to all three counts of the Indictment.  *Id*. at 1723.  It completely parallels the language that would appear in a jury verdict if the case had been tried to a jury and tells the reader nothing about the judge's reliance on any particular evidence presented.  The Second District's finding that the DNA evidence was essentially immaterial is not an unreasonable determination of the facts based on the evidence presented.

Admission of the DNA evidence through the Squibb testimony violated the Confrontation Clause, but the error was harmless.  Hartman's Seventh Ground for Relief should be dismissed.

**Ground Eight:  Ineffective Assistance of Trial Counsel:  Failure to Raise Confrontation Clause Objection**

In his Eighth Ground for Relief, Petitioner asserts he received ineffective assistance of trial counsel when his trial attorney did not make a Confrontation Clause objection to the Squibb testimony.  Respondent defends this Ground for Relief on the merits, arguing this Court should defer under AEDPA to the Second District's decision of this claim (Return, ECF No. 6, PageID

1160).

The Second District dismissed this claim because it found admission of the DNA evidence was harmless.  It recognized that trial counsel had failed to object, but implicitly held Hartman was not prejudiced thereby.  While it reviewed the DNA evidence only for plain error, it did not find that plenary review of this claim would have produced a different result.

Hartman's Reply reiterates his claim that admission of the DNA evidence was a structural error and therefore raising the objection would have preserved for appeal an issue requiring reversal because harmless error analysis would not have been allowed (Reply, ECF No. 18, PageID 2040-45).  For the reasons given in discussing the Seventh Ground for Relief, this structural error argument is unpersuasive.

Because admission of the DNA evidence was harmless error, Hartman was not prejudiced by his attorney's failure to object.  Therefore, dismissal of this claim by the Second District was not an objectively unreasonable application of *Strickland* and is entitled to AEDPA deference.


**Ground Nine:  Ineffective Assistance of Counsel:  Failure to Obtain Hartman's Recorded Statement**

In his Ninth Ground for Relief, Petitioner asserts he received ineffective assistance of trial counsel when his trial attorney failed to obtain Petitioner's tape recorded statements prior to trial or, if they did not exist, to withdraw and become a witness as to the content of those statements.

Respondent asserts this Ground for Relief is procedurally defaulted by failure to pursue it on direct review by the Supreme Court of Ohio or, in the alternative, that the Second District's decision is entitled to deference under AEDPA (Return, ECF No. 6, PageID 1161, 1170).

The Second District decided this particular claim of ineffective assistance of trial counsel as follows:

[*P57] We also conclude that Hartman has not shown prejudice by his counsel's failure to obtain a copy of the video recorded interrogations with the detective from the Oakwood Police Department. Defense counsel was present with Hartman at the time of the interviews, which should have adequately prepared counsel for making strategic plans to cross-examine the detective, and to prepare Hartman for potential cross-examination during his trial testimony. Hartman has not established how discovery of the video recordings would have led to a different outcome at trial.

*Hartman*, 2016-Ohio-2883. This claim is not among those raised by asserting a proposition of law to the Supreme Court of Ohio (See Memorandum in Support of Jurisdiction, State Court Record, ECF No. 5, PageID 410).

Hartman did raise this claim in his petition for post-conviction relief under Ohio Revised Code § 2953.21:

**FOURTH GROUND FOR RELIEF**: Mark Hartman was denied the effective assistance of counsel secured to him by Article I,§ 10 of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution at trial by counsels' failure to secure Mark Hartman's tape recorded statements made to Detective Steve Norris prior to trial and when the tape recorded statements were no longer available[footnote omitted], to remove themselves as defense counsel, because at least Christopher R. Conard then became a witness. As a result of counsels' deficient performance, Mark Hartman was prejudiced.

(Post-Conviction Petition, State Court Record, ECF No. 5, PageID 527.) Judge Tucker dismissed this Ground for Relief on the State's Motion for Summary Judgment because Hartman had not submitted evidentiary materials in support so as to require an evidentiary hearing and, more importantly, the statement by Hartman during the police interview which would have allegedly have shown he admitted to digital penetration of Weckesser before trial was adverted to only in the rebuttal closing argument of the prosecutor and "simply was not a factor in the verdicts which were reached." (Decision, Entry and Order, State Court Record, ECF No. 5, Ex. 25, PageID 807-

809.)

On appeal, the Second District affirmed the grant of summary judgment. *State v. Hartman*, 2017-Ohio-7933 (Ohio App. 2nd Dist. Sep. 29, 2017)("*Hartman II*"). As to this particular claim, it held:

> [*P45] It appears undisputed that no recordings exist from the interview with Detective Norris. Thus, there cannot be a supportable claim that trial counsel was ineffective for failing to secure something that did not exist. Further, in his motion for a new trial, Hartman raised this issue of the recordings as part of a potential *Brady* violation by the State. Indeed, the primary evidence Hartman cites in his petition in support of his fourth ground for relief are citations to the transcript from the hearing on his motion for a new trial and letters from his trial counsel that were either presented with his motion for a new trial or reference contentions that were made in his motion for a new trial. In short, Hartman could have raised this particular ineffective assistance of counsel claim in his direct appeal from his conviction and sentence. Therefore, this ground for relief is barred by res judicata. [*State v.*] Goldwire, [2005-Ohio-5784 (Ohio App. 2nd Dist. Oct. 28, 2005)] at ¶ 11.

*Id.*

Petitioners challenges this application of Ohio's criminal *res judicata* doctrine (Reply, ECF No. 18, PageID 2046, *et seq.*) In doing so, he relies almost exclusively on Ohio case law, so that his implicit argument is that the Second District decided this issue of state law incorrectly. But a federal habeas corpus court cannot review state court decisions on questions of state law. Whereas an appellate court on habeas review decides federal law questions *de novo*. . ., the federal reviewing court is generally bound by state court interpretations of state law. *Railey v. Webb*, 540 F.3d 393, 398 (6th Cir. 2008), citing *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005) "We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Id.*, quoting *Bradshaw*, *supra*; *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005)*; Vroman v. Brigano*, 346 F.3d 598,

603-04 (6th Cir. 2003); *Caldwell v. Russell*, 181 F.3d 731, 735-36 (6th Cir. 1999); *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

Petitioner relies on the distinction in Ohio law between claims of ineffective assistance of trial counsel which can be properly adjudicated on direct appeal and those which rely on evidence outside[11] the record. Petitioner notes the recognition of that distinction in *McGuire v. Warden,* 738 F.3d 741, 752 (6th Cir. 2013).[12] But neither *McGuire* nor any other authority cited by Petitioner authorizes this Court to override a state appellate court decision that a particular claim of ineffective assistance of trial counsel could, on the record before that court on both appeals, have been adjudicated on the direct appeal.

To put the matter clearly in terms of the required *Maupin* analysis, Ohio has a procedural rule that requires ineffective assistance of trial counsel claims which can be raised on direct appeal to be adjudicated in that forum. The Second District expressly enforced that rule here. Ohio's doctrine of *res judicata* in criminal cases, enunciated in *State v. Perry,* 10 Ohio St. 2d 175 (1967), is an adequate and independent state ground of decision. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417, 427 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994)(citation omitted); *Van Hook v. Anderson*, 127 F. Supp. 2d 899, 913 (S.D. Ohio 2001). The Ohio courts have consistently enforced the rule. *State v. Cole*, 2 Ohio St. 3d 112 (1982); *State v. Ishmail*, 67 Ohio St. 2d 16 (1981). The rule is on its face independent of federal law. Thus, the *Maupin* factors are all satisfied in this case.

---

[11] "*Dehors*" the record in law French. Fortunately this is one of the very few law French terms that persist in Ohio law. The Anglo-Saxon "outside" expresses in plain English exactly the same concept.

[12] *McGuire*, a capital case, arose from a decision of this Court declining to apply the *Martinez/Trevino* exception for procedural default in post-conviction in Ohio. This Court's refusal to do so was upheld by the circuit court, but is no longer good law on that point in light of *White v. Warden, Ross Corr. Inst.*, 940 F.3d 270 (6th Cir. 2019).

To excuse this procedural default, Hartman relies again on his claim of actual innocence (Reply, ECF No. 18, PageID 2059).  For the reasons given above in analyzing Ground Three, Hartman has not presented new evidence of actual innocence sufficient to satisfy the *Schlup v. Delo,* 513 U.S. 298 (1995) gateway.

Hartman's Ninth Ground for Relief should be dismissed as procedurally defaulted for failure to raise it on direct appeal.

**Ground Ten:  Ineffective Assistance of Trial Counsel:  Comforter Stains**

In his Tenth Ground for Relief Petitioner asserts he received ineffective assistance of trial counsel when his trial counsel did not adequately deal with stains on the comforter from the sexual encounter bed.  Respondent defends this claim on the same basis as Ground Nine (Return, ECF No. 6, PageID 1170).

Petitioner raised this claim in his Petition for Post-Conviction Relief as his sixth ground for relief:

> SIXTH GROUND FOR RELIEF: Mark Hartman was denied the effective assistance of counsel secured to him by Article I, § 10 of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution when a diagram of the comforter stains was produced for the first time at trial, and counsel failed to seek a continuance to analyze same and to fully utilize it at Mark Hartman's trial and/or to recall witnesses who had previously testified, all of which was objectively deficient performance. As a result of counsel's deficient performance, Mark Hartman was prejudiced.

(Post-Conviction Petition, State Court Record, ECF No. 5, PageID 544.)

Judge Tucker initially concluded this claim was bared by *res judicata* because it could have been raised on direct appeal (Decision, State Court Record, ECF No. 5, Ex. 25, PageID 811, relying

on *Goldwire, supra*.). He also concluded that the claim would fail on the merits because Hartman had offered no evidence of what would have been discovered if further analysis had been done or that it would likely have affected the outcome of the trial. *Id.* at PageID 812.

Petitioner presented this Ground for Relief to the Second District as his Eighth Assignment of Error. The Second District affirmed on the basis of Judge Tucker's *res judicata* ruling, noting

> [*P57] In support of this ground for relief, Hartman only cited evidence that was submitted to the trial court in support of Hartman's motion for a new trial. The motion for a new trial, along with the affidavit in support of the motion, were part of the record in Hartman's direct appeal from his conviction and sentence. Hartman could have raised this same argument with the same evidence in his direct appeal from his conviction and sentence. Therefore, we agree with the trial court that Hartman's claim in his sixth ground for relief is barred by res judicata. *Goldwire* at ¶ 11.

*Hartman II*, 2017-Ohio-7933.

In his Reply Petitioner argues this is a misapplication of Ohio's criminal *res judicata* doctrine because counsel could not have been expected to argue his own ineffectiveness on appeal. (Reply, ECF No. 18, PageID 2061, citing *State v. Lentz*, 70 Ohio St. 3d 527 (1994), which in turn relied on Judge Rice's seminal decision in *State v. Carter*, 36 Ohio Misc. 170 (Mont. Cty. CP 1973). The same proposition was endorsed by the Supreme Court in *Christeson v. Roper,* 574 U.S. 373, 378 (2015), citing Restatement (Third) of Law Governing Lawyers § 125 (1998).

Hartman was represented at trial by attorneys Christopher Conard and Sasha Vandegrift Blaine. By the time of the Amended Motion for New Trial, Blaine had been replaced by attorney Jennifer Roberts. But by the time of the direct appeal, Hartman was represented by his present counsel, attorneys Lawrence Greger and S. Adele Shank; they suffered from no conflict of interest regarding the trial representation and indeed made several claims of ineffective assistance of trial counsel on direct appeal. They continued to represent Hartman in filing the Petition for Post-

Conviction Relief, but, as the Second District found, submitted no evidence that had not been a part of the record on direct appeal.  Present counsel note that Conard's focus as to the comforter in the motion for new trial was on a claim under *Brady v. Maryland*, 373 U.S. 83 (1963).  But that does not negate the Second District's conclusion that all the evidence on this claim presented by present counsel in post-conviction had already been made part of the record before direct appeal.

Counsel argue that evidence outside the record was needed to prove attorney Conard's ineffectiveness (Reply, ECF No. 18, PageID 2063).  They state

> The evidence *dehors* the record includes, but is not limited to, how the diagrams use for cross examination purposes was all but eliminated, what witnesses Conard would have recalled, and how he would have woven the diagram's exculpatory nature into the fabric of his case. Conard swore that the late production prejudiced Hartman's case. Yet, in an effort to dispense with the collateral attack on the judgment, the trial court narrowed the issue presented, mischaracterized it, grasp [sic] for an easy out (res judicata) and foreclosed relief to Hartman postconviction, by erroneously granting the state's motion for summary judgment.

*Id.* at PageID 2064.  The Petition for Post-Conviction Relief is supported by almost eighty pages of exhibits, all of which were outside the direct appeal record (PageID 573-650), yet the Reply provides no record citation to which portions of those exhibits are relied on to show the Second District made an unreasonable determination of facts about what supported the post-conviction petition.  In ordering an answer in this case, the Court ordered

> When the record is filed electronically, the Court's CM/ECF filing system will affix a unique PageID number to each page of the record, displayed in the upper righthand corner of the page. **All papers filed in the case thereafter by either party shall include record references to the PageID number.**

(ECF No. 2, PageID 71, emphasis supplied.)  This language in the Order for Answer merely reminds the parties of the provisions of S. D. Ohio Civ. R. 7.2(b)(5):

> (5) **Pinpoint Citations.** Except for Social Security cases, which must comply with S.D. Ohio Civ. R. 8.1(d), a**ll filings in this Court that reference a prior filing must** provide pinpoint citations to the PageID number in the prior filing being referenced, along with a brief title and the docket number (ECF No. ___ or Doc. No. ___) of the document referenced (emphasis in original).

If Petitioner files objections to this Report, he shall comply with that requirement, particularly as to this Ground for Relief.

Petitioner has not shown that the Second District's determination that the evidence relied on to support this claim was already in the record at the time of direct appeal was an unreasonable determination of the facts based on the evidenced of record. On that basis the Second District's decision was an appropriate enforcement of Ohio's *res judicata* rule. Hartman's claim of excusing actual innocence is unavailing here as it was with prior Grounds for Relief.

Petition's Tenth Ground for Relief should be dismissed as procedurally defaulted.


## Ground Eleven: Ineffective Assistance of Trial Counsel: Waiver of Privilege and Work Product

In his Eleventh Ground for Relief, Petitioner asserts he received ineffective assistance of trial counsel when his trial attorney delivered his statement to the lead detective on the case, given that the statement was "concocted" and its delivery effected a waiver of attorney-client communication privilege and attorney work product protection.

Respondent asserts this Ground for Relief is procedurally defaulted by Hartman's failure to carry it forward from the Second District to the Supreme Court of Ohio on direct review (Return, ECF No. 6, PageID 1170). Hartman responds that it was properly presented in post-conviction where it was supported, as required, by evidence outside the appellate record (Reply, ECF No. 18, PageID 2068).

On direct appeal. counsel assigned as error that Conard advised Hartman to give a written statement to the police.  (Brief of Appellant, State Court Record, ECF No. 5, PageID 242-44).  The Second District decided this assignment of error as follows:

> Hartman claims that his counsel was ineffective when he was directed to provide a written statement to the police, and to cooperate fully in a police interrogation. In hindsight, Hartman is able to identify that this strategy of his defense counsel to fully cooperate with the investigation against him caused difficulty in defending inconsistent statements that may have impacted his credibility at trial. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *State v. Woullard,* 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, P 37 (2d Dist.), citing *Strickland, supra*; *State* v. *Parker*, 2d Dist. Montgomery No. 19486, 2003-Ohio-4326, P 13. Throughout the trial, it is apparent that the defense strategy was to prove that the victim consented to the sexual conduct, and that Hartman did not purposely force her to submit to the sexual conduct. Both his written statement and the statements Hartman made to the police consistently asserted that the victim had consented to the sexual encounter. Hartman and M.W. are the only two witnesses to the sexual conduct, which would inevitably lead to a question of which witness to believe. It was reasonable, in light of counsel's perspective at the time, to pursue a strategy not to let the victim's version of events go unanswered in the investigative stage. We conclude that counsel's strategy of cooperation with the police investigation, under the circumstances of this case, did not constitute ineffective assistance of counsel.

*Hartman, supra*, ¶ 46.  Hartman did not include this assignment of error as a proposition of law on his appeal to the Supreme Court of Ohio (See Memorandum in Support of Jurisdiction, State Court Record, ECF No. 5, PageID 410).

In the Post-Conviction Relief Petition, Hartman specifically pleaded this claim in the same terms he presents it here as his Third Ground for Relief (Post-Conviction Petition, State Court Record, ECF No. 5, PageID 520).  Judge Tucker concluded the first part of this claim – that Conard provided a statement from Hartman to the police before determining that it aligned with the

physical evidence – was barred by *res judicata* per the Second District's decision as quoted above (Decision, State Court Record, ECF No. 5, PageID 806.)  The balance of the claim – that the statement was concocted in part by using portions of a similar statement from another client – he decided on the merits, finding that Hartman had affirmed the statement and that in any event it had not affected his assessment of credibility and was within the range of appropriate attorney performance.  *Id.* at PageID 806-07.

The Second District affirmed, holding

> [*P40] We agree with the trial court that much of what Hartman raises in his third ground for relief is barred by res judicata, because these arguments were raised or could have been raised in his direct appeal. *Goldwire* at ¶ 11. Further, there is no evidence that Hartman did not agree with his counsel's advice or that he did not knowingly waive his rights. Rather, the evidence submitted by Hartman in his petition supports a finding that Hartman and his counsel discussed writing a statement and Hartman then wrote a statement that both he and his counsel revised before it was presented to the lead detective. We agree with the trial court that the emails between Hartman and his trial counsel, which were attached to Hartman's petition for post-conviction relief, are insufficient to create a genuine issue of material fact that Hartman's counsel committed professional errors or that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. R.C. 2953.21(D). Moreover, these emails are insufficient to warrant an evidentiary hearing. R.C. 2953.21(C).

*Hartman II*, 2017-Ohio-7933

Petitioner disputes the *res judicata* finding by arguing many asserted facts outside the appellate record which he says support his claim (Reply, ECF No. 18, PageID 2069-75).  Here as with the Tenth Ground for Relief there is a paucity of record citations to support this claim.  For example, regarding the instruction to write the statement, the Reply asserts "Conard knew that Hartman had consumed alcohol to the point of intoxication, provided by Conard's other client, Gordon Lowden, the night before." *Id.* at PageID 2070, but no record reference is given.  From

that point the Reply continues for half a page to make factual assertions, presumably thought to be material to the argument, with no record citations. Finally, at the middle of PageID 2071 the Reply quotes from an Affidavit of Beth Horvath, Petitioner's mother, about what Conard said and did not say to Petitioner about the use of the statement. The Reply then resumes making factual assertions without record references (PageID 2071-73).

Petitioner argues as a general matter *res judicata* does not properly apply when a post-conviction petition is supported by evidence outside the record. *Id.* at PageID 2075, citing, *inter alia, State v. Finfrock*, 1998 Ohio App. LEXIS 4889 (2nd Dist. Oct. 16, 1998); *State v. Franklin*, 2002-Ohio-2370 (Ohio App. 2nd Dist. May 17, 2002); and *McGuire*, 738 F.3d 741 (6th Cir. 2013). The quoted language from *Finfrock* depends in turn on the leading case, *State v. Cole,* 2 Ohio St. 3d 112 (1982). But neither *Cole* nor any other authority cited or of which the Magistrate Judge is aware holds that *res judicata* can be defeated just by filing some supportive material that was not part of the appellate record. Rather, a defendant must show that the new evidence is necessary to decide the claims made. A contrary rule allowing any new supportive evidence to defeat *res judicata* would completely undermine that doctrine because resourceful counsel could almost always find some new relevant evidence which was not in the appellate record. Here the Second District held part of this claim could have been adjudicated on direct appeal and Petitioner has not shown that was an unreasonable determination of the facts.

Part of the claim was not barred by *res judicata* – the part accusing Conard of "concocting" the statement Hartman signed by using a statement of a prior client as a "template." Current counsel gratuitously accuse Conard even of unprofessional conduct toward the prior client by not protecting his confidentiality without a showing that the "template" was confidential.

Conard suggested including from the prior client's statement, "Molly and I were sexually

irresponsible, inexperienced and immature. Although we were strangers, we were consenting

adults . . . [T]he decisions made will follow and haunt me for the rest of lives." (Reply, ECF No.

18, PageID 2076.) Current counsel criticize Conard's advice by claiming:

> Hartman did not insert the last paragraph in his own statement, although having the template. Why?
>
> 1) Neither Hartman nor Weckesser were "sexually irresponsible". Weckesser was on birth control and Hartman used a condom. Courtney Potter sheds light on Weckesser's experience when she testified, she did not believe that the night spent with Hartman was the first time that Weckesser had spent the night with a boy in the same room. ECF Doc. 7-1, Trans., PAGEID# 1341;
>
> 2) Neither Hartman nor Weckesser was "inexperienced" (See #1);
>
> 3) Both were in their twenties, both had prior sexual experience, and neither was immature;
>
> 4) They were not strangers. As Hartman wrote in his statement, "I remember talking to Molly about where she went to school and grew up. I found out that her last name, Weckesser, making her related to Nicole Weckesser whom Gordon, Marcus and I went to grade school [with]. I thought it was cool meet another one, because of how genuine the family is towards all of us". ECF Doc. 5-2 PAGEID# 582;
>
> 5) "The decisions made will follow and haunt me for the rest of lives" was inserted by Conard and is tantamount to a confession.

*Id.* at PageID 2077. Petitioner has adequately shown that Conard gave Hartman advice to

incorporate this language into his statement, but he did not do so. Hence there is no *Strickland*

prejudice from the bad advice.

Current counsel treat the suggested inclusions as indisputably wrong, but the Magistrate

Judge believes some of the suggested characterizations of what occurred are well taken. The

evidence showed Weckesser and Potter shared two bottles of wine between them and Hartman had

far more alcohol than that. It is hardly "sexually responsible" to engage in sex with that much

alcohol in one's system. We have no evidence of the prior sexual experience of either person;[13] we know only that they were equipped with contraceptive means. It is indisputable that they met for the first time that night; conversation about families, relationships, etc., between rounds of sexual intercourse hardly made them less than strangers. Being twenty years old does not make one "mature;" current neuroscience suggests that the human pre-frontal lobe, the part of the brain that produces "executive function" decisions, is not fully mature at twenty.

It is hardly malpractice for any attorney to use forms and models developed over time in assisting a new client.[14] In this case the defense strategy of admitting the sexual conduct and expressing remorse for any bad results was a reasonable strategy. The Second District's conclusion that it was not ineffective assistance of trial counsel deserves deference under *Strickland*.

Ground Eleven should be dismissed because it is in part procedurally defaulted[15] and in part without merit.

## Ground Twelve: Ineffective Assistance of Trial Counsel: Waiver of Jury Trial

In his last Ground for Relief, Hartman claims he received ineffective assistance of trial counsel when counsel advised him to waive a jury trial (Petition, ECF No. 1, PageID 64). Hartman raised this claim for the first time in his Petition for Post-Conviction Relief as the Tenth Ground for Relief (Post-Conviction Petition, State Court Record, ECF No. 5, Ex. 20, PageID 569.) In the

---

[13] We are prevented from learning about Weckesser's prior experience by the rape shield law.
[14] If following models so old that their rationale is lost in the mists of time were not a venerable practice at the bar, one might ask why paragraphs 90, 123, 128, 143, 163, 172, 193, 201, 205, 247, 266, and 291 of the Petition all repeat verbatim "petitioner incorporates herein by reference all previous paragraphs as if fully rewritten herein."

[15] Hartman's claim of excusing actual innocence is unavailing here for the reasons given above: he has produced no qualifying new evidence.

Petition here, Hartman phrases the claim as trial counsel's giving "false and legally baseless reasons for a jury waiver"; in state court he alleged his counsel "failed to obtain his informed consent" to the waiver.  *Id.*  These appear to be two sides of the same coin:  if your decision is induced by false information I give you, then it is arguably not knowing and intelligent.  In any event, Respondent concedes they are the same claim for purposes of this case (Return, ECF No. 6, PageID 1179).

Judge Tucker decided this claim against Hartman on the merits, concluding that the choice of a bench trial instead of a jury is a strategic choice on which counsel's experience and advice properly have much weight (Decision, State Court Record, ECF No. 5, PageID 815-17, relying on *State v. Linehan,* 1998 Ohio App. LEXIS (2nd Dist. Sept. 4, 1998).  The Second District affirmed,[16] holding:

> [*P76] Hartman contends that the trial court erred in finding that counsel's advice to waive a jury trial was not objectively unreasonable. According to Hartman, the following evidence shows that there is a genuine issue of material fact as to whether the advice was objectively unreasonable: (1) Counsel first informed the trial court at a bond conference "that the family would probably be going with a bench trial"; (2) counsel told Hartman's family that he had a good relationship with the judge, which Hartman's grandfather interpreted as being strong enough for the judge to find reasonable doubt; (3) counsel informed Hartman that the trial court judge raised three sons when in fact he had raised three daughters; (4) counsel did not explain the benefits of the jury trial and that one juror could save the defendant; (5) on August 11, 2014, counsel stated to the family that he had not been provided with all the discovery and was going to write a letter; (6) counsel did not write the discovery letter until August 26, 2014, and (7) Hartman executed the jury trial waiver on August 20, 2014. Hartman Appellate Brief, p. 57-58.
>
> [*P77]  "Defense counsel's [advice] to a client to waive his right to a jury trial has been considered sound trial strategy in the absence of record evidence showing otherwise." *State v. Neitzel*, 2d Dist. Miami No. 98 CA 11, 1998 Ohio App. LEXIS 4958, 1998 WL

---

[16] On appeal Hartman again changed the wording of the assignment of error: "counsel failed to accurately advise Hartman on the costs and benefits of waiving a jury trial."  *Hartman II*, 2017-Ohio-7933 at ¶ 73.

735942, *6 (Oct. 23, 1998). Further, Hartman "has not suggested a single reason why the outcome of the trial would probably have been otherwise had he been tried by a jury rather than before a judge." *Id*. See also *State v. Aaron*, 10th Dist. Franklin No. 00AP-268, 2000 Ohio App. LEXIS 5534, 2000 WL 1753151, *4 (Nov. 30, 2000) ("Without supporting evidence, the mere claim that a jury would have believed defendant falls far short of establishing a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

[*P78] We conclude that trial counsel's advice to Hartman to waive his right to a jury trial was a reasonable trial strategy that does not rise to the level of ineffective assistance of counsel and Hartman has failed to put forth sufficient operative facts to establish that there is a reasonable probability that the result of the trial would have been different if it was tried to a jury rather than a judge. Therefore, the trial court properly dismissed the tenth ground for relief in Hartman's petition. The eleventh assignment of error is overruled.

*Hartman II*, 2017-Ohio-7933.

Petitioner asserts that "[w]hen defense counsel incorrectly advises the defendant on the consequences of jury waiver, the waiver was not a knowing, intelligent, and voluntary relinquishment of a known right." (Reply, ECF No. 18, PageID 2080.) In support he relies on *Padilla v. Kentucky*, 559 U.S. 356 (2010), where a consequence of the waiver could have been deportation and no advice was given as to that possible consequence. He also relies on *Hill v. Lockhart*, 474 U.S. 52 (1985), where the Court held that the "voluntariness of the [guilty] plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Id.* at 56.

Hartman claims he

waived his jury trial because he was told by Conard in the presence of his parents, grandfather and uncle that 1) defense counsel's relationship with the judge was such that a bench trial was the better route; 2) that the judge "raised sons and so he would understand" when in fact the Judge had raised three daughters; 3) that with the current media coverage of these kinds of cases on college campuses, Hartman could not expect to get all twelve jurors to believe him

(thereby leaving the impression that Hartman had to convince all twelve jurors of the truth of the facts), when in fact Hartman had to convince no jurors because he had no burden of proof; 4) when you go to a bench trial, only a judge rules on the evidence, and "there is no evidence of a rape" in Mark's case; 5) "do you want twelve uneducated people or an educated judge to make the decision?"

Hartman, his parents, grandfather and uncle were never told by defense counsel what the effect of the waiver of a jury trial would be, including but not limited to the fact that on direct appeal, issues related to evidentiary questions would be severely limited if not eliminated and that one juror not believing the complaining witness could alone, foreclose a finding of guilt.

(Reply, ECF No. 18, PageID 2082, citing Affidavit of Beth Horvath, ¶ 43, State Court Record, ECF No. 5-2, PageID 641-42.) What the Horvath Affidavit actually says at ¶ 43 on the jury waiver issue is

On Monday August 11, 2014 John, Mark, my father, my brother and I met at Chris' office beginning at 5:30 p.m. . . .In that meeting, the waiver of Mark's right to a jury trial was discussed. Chris discussed a bench trial versus a jury trial. Chris stated the benefits of a bench trial but never explained how a jury trial would work. He mentioned the following benefits to a bench trial, 1) there are three to five judges before whom he would do a bench trial and that Judge Tucker would be one of them; 2) the Judge was fair and that Chris had a good relationship with him; 3) Judge Tucker had all sons and would understand from a male's point of view; 4) Chris stated it would be hard to get all twelve jurors to side with Mark with all of the media coverage that is out there regarding these kinds of cases: "Would you rather have twelve uneducated people making the decision or an educated judge"? We were not aware that just one juror who did not agree, could save our son. Chris sold the bench trial firmly without explaining the benefits of a jury trial. Chris never told us that a Judge could overturn a jury's verdict, or that a bench trial decision was very hard to reverse, we learned that only after Mark was convicted. It was decided that Mark would appear and waive his right to a jury trial on the advice of Chris.

*Id.*

Importantly, Conard did not recommend a bench trial over a jury trial as a general matter, but would do so only for three to five judges, including Judge Tucker, presumably out of the eleven

General Division Common Pleas Judges who try felony cases in Montgomery County.  That certainly supports his advice to try the case to the bench, as well as his comment that Judge Tucker was fair.  Hartman does not argue that was false advice.

Hartman does argue that he was not told that one juror could "save our son," in his mother's words.  Technically, one juror can cause a mistrial which does not equate to an acquittal.  Particularly in high profile cases, which this apparently was, the prosecutor may feel pressure to retry the case.

Conard mentioned the likelihood of press coverage and how that might impact a jury.  Hartman does not argue that that was false and given the intense press coverage of the Brock Turner case which occurred about a year later, it seems prescient.  Conard's comment that there was no rape here is certainly consistent with Hartman's continued insistence on his innocence and an experienced judge is more likely to carefully weigh complex and inconsistent evidence such as was given here than a jury.  While it is technically true that, because consent is not an affirmative defense, Hartman had no burden of proof, as a practical matter proving Weckesser's consent was the only defense Hartman had.  If he could not persuade the trier of fact that she consented, he probably could not have prevailed because there was DNA evidence to prove vaginal intercourse and probably DNA evidence to prove both oral and anal intercourse if the facts of that conduct had been denied.  Again, it is technically true that there are differences between appellate review of evidence questions in bench and jury trials – judges are presumed, for example, to have ignored irrelevant evidence.  But the standard for review of credibility decisions is exactly the same – and very narrow – regardless of whether a jury or a judge tried the case.

In sum, even if the question of the advice to try the case to the bench were before this Court *de novo*, the Magistrate Judge would find the advice reasonable.  However in habeas the issue is

whether the Second District's decision is a reasonable application of *Strickland* – and it is.

On the prejudice prong of *Strickland*, Petitioner asserts "[p]rejudice directly flows from or is presumed by the forfeiting[17] of a constitutional right on false and legally baseless grounds." (Reply, ECF No. 18, PageID 2082.)  Not so.  How was Hartman prejudiced by trying the case to the bench?  What proof does he offer that he would have been acquitted by a jury?

Turning from what Conard did or did not tell Hartman and his family, Petitioner's counsel then focus on the minimum information necessary for a valid jury waiver, citing *United States v. Martin,* 704 F.2d 267 (6th Cir. 1983).  The *Martin* court recited factors necessary for a valid jury waiver including some understanding by the defendant:

> Moreover, a defendant ignorant of the nature of the jury trial right cannot intelligently weigh the value of the safeguard. A defendant, therefore, should have both the mental ability and some knowledge of the jury trial right before he is allowed to waive it. See *Adams,* 317 U.S. at 280; *United States ex rel. McCann,* 320 U.S. at 221. A technical knowledge of the jury trial right, however, is not what is required. Cf. *Faretta v. California,* 422 U.S. 806, 837 (1975). A defendant is sufficiently informed to make an intelligent waiver if he was aware that a jury is composed of 12 members of the community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and that a judge alone will decide guilt or innocence should he waive his jury trial right. See *United States v. Delgado,* 635 F.2d 889, 890 (7th Cir. 1981). Knowledge of these essential attributes is generally sufficient to enable a defendant to make a knowing and intelligent decision.

704 F.2d at 273 (parallel citation omitted).

In this case Petitioner executed a Jury Waiver which he asserted was voluntary (State Court Record, ECF No. 5, Ex. 3, PageID 85).  According to Judge Tucker, Hartman acknowledged in his Petition for Post-Conviction Relief that the waiver occurred in open court after a discussion with the court (Decision, State Court Record, ECF No. 5, Ex. 27, PageID 815).  However, no

---

[17] The right to jury trial here was not "forfeited," but waived, following the procedure required in Ohio law.  Note the distinction referenced in note 8 supra.

transcript of that proceeding has been filed as part of the State Court Record in this case.  In the absence of a transcribed record showing that Judge Tucker did not adequately inform Hartman of the consequences of waiving a jury, this Court presumes the regularity of those proceedings. *Walker v. Johnston*, 312 U.S. 275, 286 (1941).

As part of their complaint against Conard, Hartman and his family complain that they "were so ill-informed they did not understand 'the Judge did not receive the same discovery that we had been provided and that the only thing the Judge could consider was everything admitted at trial.'"  (ECF No. 18, PageID 2089-90.)  That is a red herring.  Failure of a trial attorney to explain to a client, much less his whole family, that not everything disclosed in discovery becomes evidence hardly makes a subsequent jury waiver involuntary.

Counsel conclude the Reply with a three-page list of things trial counsel could have done in the handling of this case, including attacking the indictment, demanding a bill of particulars, moving for discovery, adding female co-counsel the day before trial, interviewing other persons who were present at the "party," handling polygraph examinations better, and preparing Hartman for cross-examination (ECF No. 18, PageID 2093).  Many of these asserted deficiencies are not raised as part of those Grounds for Relief alleging ineffective assistance of trial counsel.  Counsel end the Reply by offering the opinion of Hartman's grandfather, "experienced with litigation for more than twenty years as the CEO of a major local hospital,"[18] that "there was little or no preparation to try my grandson's case.  It was my impression that Chris would take notes and then forget about the case until we met again."  (ECF No. 18, PageID 2094.)  Although this language appears in quotation marks, no citation to the record is given.  However experienced Hartman's grandfather may be with civil litigation, a habeas corpus court cannot accept his off-record non-

---

[18] Identified elsewhere in the Reply as Dayton Children's Hospital.

expert, uncross-examined opinion as a basis for finding the Second District Court of Appeals unreasonably found facts and applied the law.

## Conclusion

This is undoubtedly a tragic case. Two young person's lives were irrevocably and perhaps irremediably changed by the admixture of underage alcohol and sex on just one occasion. When occasions like that are brought into the criminal justice system and there really are only two witnesses to the critical facts, the case will inevitably turn on the factfinder's assessment of credibility. Hartman and his trial attorney obviously believed he was innocent in the sense that Weckesser consented and believed he would credibly persuade Judge Tucker of that. Current counsel point to no reason why Hartman would not have been credible and apparently believe him themselves because they repeatedly assert he is actually innocent. He may still believe that he is, but when he decided to have sex with a person who credibly believed he was raping her, he took a risk which turned out very badly for both of them. Habeas corpus is not a cure for the results.

It is respectfully recommended that the Petition be dismissed with prejudice.

## Certificate of Appealability

When it enters judgment in this case, the Court must grant or deny a certificate of appealability as to each Ground for Relief. Rule 11, Rules Governing § 2254 Cases. Despite the length of the pleadings in this case (314 pages), the parties have not addressed the appealability issue and the Magistrate Judge is reluctant to make a recommendation without briefing.

Accordingly, it is hereby ORDERED that Petitioner file a motion for certificate of appealability

not later than fourteen days after Judge Rice rules on this Report and any supplemental report.


April 23, 2020.

s/ *Michael R. Merz*
United States Magistrate Judge


## NOTICE REGARDING OBJECTIONS


Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.